**Priscilla GARCIA; Maricela Buitrago; United Food and Commercial Workers International Union, AFL–CIO, Plaintiffs–Appellees,**

v.

**SPUN STEAK COMPANY, a California corporation, Defendant–Appellant.**

No. 91–16733.

United States Court of Appeals, Ninth Circuit.

Dec. 27, 1993.

Before: BOOCHEVER, NOONAN, and O'SCANNLAIN, Circuit Judges.

The order filed October 29, 1993, with dissent, is ordered published.

The panel, with Judge Boochever dissenting, has voted to deny appellees' petition for rehearing. Judges Noonan and O'Scannlain have voted to reject the suggestion for rehearing en banc and Judge Boochever has recommended acceptance of the suggestion for rehearing en banc.

The full court was advised of the suggestion for rehearing en banc. An active judge requested a vote on whether to rehear the matter en banc. The matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed.R.App.P. 35.

The petition for rehearing is DENIED and the suggestion for rehearing en banc is REJECTED.

REINHARDT, Circuit Judge, dissenting from denial of rehearing en banc:

Once again, a civil rights principle is the loser at the hands of an unsympathetic court.[1] In this case, by a divided vote, a three-judge panel invalidated an Equal Employment Opportunity Commission (EEOC) Guideline of national scope, upheld an employment rule that discriminates against national-origin minorities without requiring any showing of business justification, and challenged the EEOC's ability to enact rules codifying its findings regarding specific discriminatory practices. *See Garcia v. Spun Steak Co.,* 998 F.2d 1480 (1993). The two judges in the majority were able to do so only by improperly substituting their policy judgments for those of the EEOC and by misconstruing, or, in one instance, completely disregarding, prior case law.

This circuit, with its enormous immigrant population, a large proportion of whom arrived here only recently, is now the only circuit in the nation in which an employer may adopt a discriminatory English-only rule without even articulating a business justification to support it. Unfortunately, the growth of the immigrant population and the present mood of anti-immigrant backlash mean that English-only rules are likely to become more prevalent. In overriding the EEOC's determination that such rules are generally discriminatory, the *Spun Steak* panel subverted one of the basic goals of Title VII of the Civil Rights Act of 1964, the elimination of dis-

---

**1.** In one recent period, five major decisions hostile to civil rights were handed down by the Supreme Court only to be overturned by Congress in the Civil Rights Restoration Act of 1991. *See Patterson v. McLean Credit Union,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Lorance v. AT & T Technologies, Inc.,* 490 U.S. 900, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989); *Martin v. Wilks,* 490 U.S. 755, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989); *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989); *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

crimination on the basis of national origin. Accordingly, I dissent from the court's refusal to rehear *Spun Steak* en banc.

### I. Background.

Plaintiffs Priscilla Garcia and Maricela Buitrago are production line workers at Spun Steak Company ("Spun Steak"), a California corporation that produces poultry and meat products for wholesale distribution. Plaintiff Local 115, United Food and Commercial Workers International Union ("Local 115"), is the collective bargaining agent representing Spun Steak employees.

Of the thirty-three workers employed at Spun Steak, twenty-four are Spanish-speaking. Virtually all of Spun Steak's Spanish-speaking employees are Hispanic. Their command of English varies greatly: two employees speak no English, others have limited English proficiency, while some such as Garcia and Buitrago speak English fluently.

In September 1990, an English-only rule was instituted at Spun Steak. The rule prohibited employees from speaking Spanish on the job except during lunch and other breaks. Both Garcia and Buitrago were subsequently reprimanded for violating the English-only rule. Local 115 protested the rule and unsuccessfully requested that it be rescinded.

After investigating discrimination charges filed by Garcia, Buitrago, and Local 115, the Equal Employment Opportunity Commission found that there was reasonable cause to believe that Spun Steak violated Title VII of the Civil Rights Act of 1964 in adopting its English-only rule. In accordance with the EEOC finding, Garcia, Buitrago, and Local 115, on behalf of all Spanish-speaking employees of Spun Steak (collectively, the "Spanish-speaking employees"), filed suit in federal district court alleging a violation of Title VII and requesting injunctive relief. The Spanish-speaking employees, in accordance with the EEOC Guideline pertaining to English-only rules, made out a prima facie case of national-origin discrimination by demonstrating that Spun Steak had instituted an English-only rule, while Spun Steak attempted to rebut their showing by demonstrating a business justification for the rule. The op-posing sides filed cross-motions for summary judgment, and the district court ruled in favor of the employees. The court found that Spun Steak's English-only policy had a disparate impact on Hispanic workers without sufficient business justification, in violation of Title VII.

Spun Steak appealed the ruling to this court. The EEOC, as the federal agency charged with the interpretation and enforcement of Title VII, filed an amicus curiae brief arguing that Spun Steak's English-only policy violated Title VII, and urging that the district court judgment be affirmed. The arguments of plaintiffs and the EEOC were rejected, however, by a majority of the *Spun Steak* panel. The majority did not reach the question of whether there was a business justification for the rule. Rather, over the dissent of Judge Boochever, it invalidated the applicable EEOC Guideline and held that English-only rules are permissible with respect to bilingual employees.

### II. The Adverse Impact of English–Only Rules.

Title VII prohibits discrimination in employment based on race, color, sex, religion and national origin, 42 U.S.C. § 2000e–2. The close relationship between language and national origin led the EEOC to classify discrimination based on "linguistic characteristics" as unlawful under Title VII (29 C.F.R. § 1606.1), a classification which the *Spun Steak* panel does not challenge. *See Fragante v. City and County of Honolulu*, 888 F.2d 591, 595 (9th Cir.1989), *cert. denied*, 494 U.S. 1081, 110 S.Ct. 1811, 108 L.Ed.2d 942 (1990) (approving § 1606.1).

The EEOC Guideline at issue in *Spun Steak* applies Title VII to English-only rules. 29 C.F.R. § 1606.7 (1991). It permits the use of such rules only where a business justification exists. The Guideline reflects the EEOC's determination that rules prohibiting the use of foreign languages generally have an adverse impact on protected groups. As the Guideline explains, "[t]he primary language of an individual is often an essential national origin characteristic," so that an English-only rule may "create an atmosphere of

inferiority, isolation and intimidation." 29 C.F.R. § 1606.7(a).

The *Spun Steak* majority disagrees with the EEOC's determination. My colleagues have in their wisdom concluded that bilingual employees do not suffer significant adverse effects from an English-only rule because they have the "choice" of which language to employ, and can thus "readily comply" with the rule. 998 F.2d at 1487. This analysis demonstrates a remarkable insensitivity to the facts and history of discrimination. Whether or not the employees can readily comply with a discriminatory rule is by no means the measure of whether they suffer significant adverse consequences. Some of the most objectionable discriminatory rules are the least obtrusive in terms of one's ability to comply: being required to sit in the back of a bus, for example; or being relegated during one's law school career to a portion of the classroom dedicated to one's exclusive use. *See McLaurin v. Oklahoma State Regents*, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950). Nonetheless, the majority focuses narrowly upon the ability to comply, substituting its own unenlightened conception of discriminatory impact for that adopted by the EEOC on the basis of its store of knowledge, wisdom and experience in the field of employment discrimination.

Language is intimately tied to national origin and cultural identity: its discriminatory suppression cannot be dismissed as an "inconvenience" to the affected employees, as *Spun Steak* asserts. *See generally* Piatt, *Toward Domestic Recognition of a Human Right to Language*, 23 Hous.L.Rev. 885, 894–98 (1986) (discussing relationship between language and culture); Karst, *Paths to Belonging: The Constitution and Cultural Identity*, 64 N.C. L.Rev. 303, 351–57 (1986). Even when an individual learns English and becomes assimilated into American society, his native language remains an important manifestation of his ethnic identity and a means of affirming links to his original culture. *See* Karst, *supra*, at 351–57. English-only rules not only symbolize a rejection of the excluded language and the culture it embodies, but also a denial of that side of an individual's personality.[2]

Thus, the *Spun Steak* majority's emphasis on the *practical* effects of English-only rules is misplaced. Whether or not an individual is, in practice, capable of speaking only English is not the important consideration here by any means. What is far more important is the impact of the prohibition itself. As the EEOC correctly determined, being forbidden under penalty of discharge to speak one's native tongue generally has a pernicious effect on national origin minorities.

Finally, it should be noted that the imposition of an English-only rule may mask intentional discrimination on the basis of national origin. *See Gutierrez*, 838 F.2d 1031, 1040 (9th Cir.1988) (citing authorities). Even those who support the majority's view acknowledge that "language can be a potent source of racial and ethnic discrimination." *Gutierrez v. Municipal Court*, 861 F.2d 1187, 1192 (9th Cir.1988) (Kozinski, J., dissenting from denial of rehearing en banc). History is replete with language conflicts that attest, not only to the crucial importance of language to its speakers, but also to the widespread tactic of using language as a surrogate for attacks on ethnic identity.[3] As these

**2.** As one commentator observed: "Language is the lifeblood of every ethnic group. To economically and psychologically penalize a person for practicing his native tongue is to strike at the core of ethnicity." Comment, *Native–Born Acadians and the Equality Ideal*, 46 La.L.Rev. 1151, 1167 (1986).

**3.** The harsh repression of Catalan and the Basque language in Spain under the dictatorship of Francisco Franco is one obvious example. *See Basques Are Waging A Difficult Battle to Preserve Language*, Dallas Morning News, Apr. 3, 1993, at 25A (Franco dictatorship "banned public use of Basque and other regional languages"). Other

more current examples include the repression of the Ukrainian, Georgian and Belorussian languages by the former Soviet government; the current repression of the Albanian language in Kosovo (formerly part of Yugoslavia); and the extended repression of the Kurdish language in Turkey. *See, e.g.,* Shiller, *Albanian Students Defy Serb Rule*, Toronto Star, Nov. 2, 1992, at A14; Robinson, *Restless Ukraine Strains at the Bonds of Soviet Empire*, Fin. Times, Sept. 4, 1990, at 6 (citing "Moscow's systematic repression of the Ukrainian language"); *Turkish–Kurdish Agonies*, Wash. Post, July 3, 1993, at A22 (discussing cultural repression of Kurds and the denial of Kurdish language rights).

examples reveal, the urge to repress another's language is rarely, if ever, driven by benevolent impulses.

Recognizing the discriminatory potential inherent in rules prohibiting the use of foreign languages, the EEOC has attempted to provide victims with legal rights. *Spun Steak's* misguided removal of that protection, based largely on two judges' subjective judgment that the discriminatory impact of English-only rules is "not significant," seriously undermines one of the basic goals of Title VII.

### III. "Compelling" Reasons for Invalidating the EEOC Guideline.

The EEOC Guideline at issue in *Spun Steak* provides that an employee makes out a prima facie case of national origin discrimination by proving that the employer has adopted an English-only rule. *See* 29 C.F.R. § 1606.7(b) (1991). The resulting presumption of discrimination is rebuttable, however. An English-only rule will be upheld if the employer shows that it is supported by a business justification. *Id.* Thus, instead of imposing a more onerous per se rule, the Guideline creates a framework of shifting burdens. Given the history of national origin discrimination in this country, the rule is surely a moderate and reasonable one.

In invalidating the EEOC Guideline, the *Spun Steak* majority virtually ignores the long-standing rule that EEOC Guidelines "constitute 'the administrative interpretation of [Title VII] by the enforcing agency,' and [that] consequently they are 'entitled to great deference.'" *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 431, 95 S.Ct. 2362, 2378, 45 L.Ed.2d 280 (1975), *quoting Griggs v. Duke Power Co.,* 401 U.S. 424, 433–434, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971). *See also Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94, 94 S.Ct. 334, 339, 38 L.Ed.2d 287

(1973) (EEOC Guideline entitled to deference unless "there are 'compelling indications that it is wrong'"); *EEOC v. Commercial Office Products Co.,* 486 U.S. 107, 115, 108 S.Ct. 1666, 1671, 100 L.Ed.2d 96 (1988) ("EEOC's interpretation of ambiguous language need only be reasonable to be entitled to deference"). Though acknowledging that only "compelling indications" that the Guideline was erroneous would justify rejecting it, the majority makes only a token effort to abide by this standard, dedicating less than a page to describing its "compelling" reasons for invalidating the Guideline.[4]

In its short discussion of the topic, the *Spun Steak* majority lists four justifications for rejecting the Guideline, none of which is persuasive, let alone compelling. 998 F.2d at 1489–90. First, the majority claims to follow *Garcia v. Gloor,* 618 F.2d 264 (5th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981) [hereinafter "*Gloor*"], in which the Fifth Circuit did not even consider the EEOC Guideline (since none existed at the time), but only described how a court would rule in the absence of agency construction of Title VII.[5] Second, unable to find specific evidence that the Guideline was erroneous, the majority contents itself with quoting general observations indicating Congress' disinclination to infringe on the independence of employers and unions except to correct discriminatory practices. 998 F.2d at 1489–90 (quoting *United Steelworkers of America, AFL–CIO v. Weber,* 443 U.S. 193, 206, 99 S.Ct. 2721, 2728, 61 L.Ed.2d 480 (1979)). Here, the majority ignores the obvious fact that correcting a discriminatory practice is precisely what the EEOC was trying do. In any event, if such self-evident and general statements are sufficient to override the deference due EEOC Guidelines, then every Guideline is in grave jeopardy.

Third, and most incomprehensible, the majority objects to the presumption of disparate

---

4. *Spun Steak's* dismissive treatment of the EEOC rule is unprecedented within the Ninth Circuit. This Court has always cited the Guidelines with approval. *See Fragante v. City and County of Honolulu,* 888 F.2d 591, 595 (9th Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1811, 108 L.Ed.2d 942 (1990); *Jurado v. Eleven–Fifty Corp.,* 813 F.2d 1406, 1411 (9th Cir.1987).

5. In fact, the Guideline at issue here was enacted shortly after *Gloor,* probably in order to reverse the effect of that decision. The majority simply ignores this history.

impact contained in the EEOC Guideline. It does so not on the merits of the presumption, but on the basis of the uncontroversial and irrelevant proposition that in disparate impact cases plaintiffs have the burden of proving the discriminatory effect of the challenged policies. The panel's "reasoning" constitutes a total *non-sequitur*.[6] There is simply no connection between the elementary proposition stated by the majority—that plaintiffs have the burden of proof—and the majority's deduction therefrom that the EEOC is *barred* from (1) making generalized findings regarding the effects of particular discriminatory policies, and (2) codifying those findings in a rule that such policies are unlawful unless justification exists in particular cases. In effect, the majority holds that the agency is without authority to determine that English-only rules and similar discriminatory practices are invalid generally.[7] The majority apparently believes that the question of the validity of a widespread discriminatory practice must be decided over and over again on a case by case basis in a private lawsuit each time a new employer adopts it. The majority's remarkably narrow view of the EEOC's authority is reminiscent of courts of the 1930s which refused to accept agency findings regarding labor and food standards.[8] It is a particularly odd view for the 1990s given the broad authority that courts have allowed agencies to exercise in recent years.

Finally, the *Spun Steak* majority cites as a reason for its decision the *absence* of legislative history regarding Title VII's applicability to English-only rules. 998 F.2d at 1490. With this argument, the majority elevates legislative history to a new height. Those who believe that even affirmative legislative history is, in general, not compelling may be surprised to learn that its absence can be so crucial as to constitute a basis for invalidating an agency rule. *See, e.g., United States v. Thompson/Center Arms Co.,* — U.S. —, —, 112 S.Ct. 2102, 2111, 119 L.Ed.2d 308 (1992) (Scalia, J., concurring in judgment) (describing legislative history as "that last hope of lost interpretative causes, that St. Jude of the hagiology of statutory construction").

### IV.  Related Cases.

The *Spun Steak* majority contends that its analysis is "consistent" with *Jurado v. Eleven–Fifty Corp.,* 813 F.2d 1406 (9th Cir.1987), and that it "follows" *Gloor.* 998 F.2d at 1487, 1489. In contrast, the majority dismisses *Gutierrez v. Municipal Court,* 838 F.2d 1031 (9th Cir.1988), *reh'g en banc denied,* 861 F.2d 1187 (1988), *vacated as moot,* 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989), in a footnote, without pretending to counter, or even examine, the case's reasoning. 998 F.2d at 1487 n. 1. In none of the three instances does the majority deal fairly with the case cited. *Gutierrez,* as a unanimous Ninth Circuit decision on precisely the same issue as faced the *Spun Steak* panel, merited examination for its reasoning and persuasive value. *Jurado* and *Gloor,*

---

**6.** The majority states that "the Supreme Court has held that a plaintiff must prove the alleged discriminatory effect before the burden shifts to the employer. The EEOC Guideline at issue here contravenes that policy by presuming that an English-only policy has a disparate impact in the absence of proof." 998 F.2d at 1490.

**7.** Under the majority's unique approach, an EEOC Guideline stating, for example, that rules requiring employees to be at least six feet tall are presumed to have a disparate impact on women would be held invalid even though the Supreme Court had held that height and weight requirements have a disparate impact on women and the factual or statistical issue is the same in all cases. *See Dothard v. Rawlinson,* 433 U.S. 321, 329–31, 97 S.Ct. 2720, 2726–28, 53 L.Ed.2d 786 (1977) (finding that Alabama prison system's

height and weight requirements disparately impact women solely on the basis of statistical evidence).

It is clear that the real basis of the majority's objection to the EEOC presumption is that the majority does not agree with the Guideline on the merits. This substantive disagreement is at least rational (though the majority's view is wrong), but it should not be transformed into a wholly baseless attack on agency authority to promulgate general rules.

**8.** Any concern for an employer's right to a fair hearing and individualized consideration is satisfied by the business justification provision of the EEOC rule, which allows the employer to articulate the specific reasons supporting an English-only policy. *See* 998 F.2d at 1490–91 (Boochever, J., dissenting in part).

while not spurned as is *Gutierrez*, are misused through selective reference.

Five years ago, this court in *Gutierrez* unanimously upheld the EEOC Guideline at issue in *Spun Steak*, holding that English-only employment rules generally have an adverse impact on national origin groups. *See* 861 F.2d at 1040. The plaintiff in *Gutierrez*, however, quit her job before her employer's appeal reached the Supreme Court. As a result, the Court vacated our decision as moot. *Gutierrez*, 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989). Unconstrained by precedential considerations, the *Spun Steak* majority wrongly declined even to consider *Gutierrez*'s reasoning. While it is true that *Gutierrez* lacks binding precedential value, it still represented the thinking of this court. As such, it was deserving of consideration. *Gutierrez* not only constituted a decision of a three-judge panel, but it had survived an en banc call. *See Gutierrez*, 861 F.2d 1187 (Kozinski, J., dissenting from denial of rehearing en banc) (joined by Judge Thompson and Judge O'Scannlain). *Gutierrez* was binding precedent within this circuit and might well have remained so, but for the happenstance of an employee's job decision.[9] As far as our court is concerned, *Gutierrez* represented its official position, following completion of all our review proceedings. As such, it merited more than a dismissive footnote in *Spun Steak*.

As the *Spun Steak* majority should have known, the validity of a case's *reasoning* is unaffected when it is vacated as moot. *See* Wright, 13A *Federal Practice & Procedure* § 3533.10 (1984). The *Spun Steak* majority cites no new caselaw to justify its different result, making it clear that the only significant change since *Gutierrez* is that of panel composition: a *Gutierrez* en banc dissenter, assigned to *Spun Steak* and having by luck of the draw picked up a second vote, was thereby transformed into the author of a two-judge majority opinion. Moreover, *Gutierrez* has proved persuasive to other courts: it was cited with approval in *Smothers v. Benitez*, 806 F.Supp. 299, 307–08 (D.P.R.1992), *Pemberthy v. Beyer*, 800 F.Supp. 144, 159 (D.N.J. 1992), and *Asian Am. Business Group v. City of Pomona*, 716 F.Supp. 1328, 1330 (C.D. Cal.1989). These three cases involved issues related to the question decided in *Gutierrez*; *Spun Steak*, ruling on the identical issue as *Gutierrez*, should at least have accorded it fair consideration.

*Spun Steak*'s use of the Fifth Circuit's *Gloor* decision is equally unacceptable. In discussing its reasons for invalidating the EEOC Guideline, the majority professes to be guided by *Gloor*. That decision, however, pre-dated the Guideline at issue. It is disingenuous for the *Spun Steak* majority to profess to follow a case which did not and could not have ruled on the validity of the affected Guideline. The *Gloor* court, in fact, specifically noted the absence of any controlling EEOC Guideline in justifying its ruling. *Gloor*, 618 F.2d at 268 n. 1.[10] Rather than following *Gloor*, it should be clear that *Spun Steak*'s rejection of the EEOC Guideline represents a radical recasting of *Gloor* in disregard of *Gloor*'s own express self-imposed limitations and of the deference due EEOC Guidelines.

Finally, there is *Spun Steak*'s reliance on *Jurado*. Before discussing *Jurado* in detail, though, one should first note something that the *Spun Steak* majority fails to mention: the *Jurado* court cites with approval the exact EEOC Guideline which *Spun Steak* rejects. *See Jurado*, 813 F.2d at 1411. An examination of *Jurado*'s facts shows why this is so.

*Jurado* involved a bilingual radio announcer, Valentine Jurado, whose show was in English, with Spanish words and phrases occasionally added. A consultant hired by the station determined that this sprinkling of Spanish hurt the station's ratings because it confused listeners about the station's programming. Accordingly, the station program director asked Jurado to stop using

---

9. Of course, the Supreme Court might have granted certiorari and affirmed or reversed—we will never know.

10. The Fifth Circuit took care to point out that: [The EEOC] has adopted neither a regulation stating a standard for testing such language rules nor any general policy, presumed to be derived from the statute, prohibiting them. We therefore approach the problem on the basis of the statute itself and the case law. *Gloor*, 618 F.2d at 268 n. 1.

Spanish in his broadcasts. Jurado refused, the radio station fired him, and he brought suit under Title VII.

No reasonable person would suggest that Title VII requires the operator of an English language radio station to permit a hired broadcaster to broadcast in whole or in part in another language, contrary to the radio station's policies. As the *Jurado* court recognized, the radio station's limited English-only rule "was a programming decision motivated by marketing, ratings, and demographic concerns." 813 F.2d at 1410. As such, it easily passed the business justification requirement. *See Gutierrez*, 838 F.2d at 1041. There is no analogy or comparison that can legitimately be drawn between the situation in *Jurado* and that in *Spun Steak*. For example, Spun Steak has never required its employees to speak or even understand English as a condition of employment, and it makes no claim that the ability to speak or understand English is a bona fide occupational qualification (BFOQ). In *Jurado*, by contrast, the employer would without question have refused to employ a non-English-speaker, or even a person who spoke English with a marked foreign accent; such a job refusals would not have constituted national origin discrimination but simply the implementation of an appropriate job qualification. *Cf. Fragante v. City of Honolulu*, 888 F.2d 591, 596 (9th Cir.1989) ("[a]n adverse employment decision may be predicated upon an individual's accent when—but only when—it interferes materially with job performance").[11]

*Spun Steak* fails to discuss these aspects of *Jurado*, even though *Jurado* is clearly the principal Ninth Circuit precedent on English-only rules. By not mentioning that *Jurado* specifically applies to the adoption of a "business-related English-only rule," 813 F.2d at

1411, or that it relies on the EEOC Guideline, the *Spun Steak* majority renders *Jurado* unrecognizable.

*Conclusion.*

By failing to take this case en banc, this court disrupts the uniform national application of an important EEOC Guideline, drastically handicaps the agency's ability to adopt other Guidelines, distorts or ignores Ninth Circuit caselaw in a highly sensitive area, and allows two of its judges to substitute their policy views regarding the subject of national-origin discrimination for the EEOC's experienced, reasoned and expert judgment. As a result, we rack up one more judicial defeat for those who most need and deserve the protection of the courts. I therefore respectfully dissent.

11. Similarly, a commentator who supports the reasoning in both *Gutierrez* and *Jurado* explains that the right to speak one's native language is:
> bounded by the actual requirements of the job and business at issue. In certain situations, it is clearly inappropriate for someone to speak a language other than English in the workplace.... [A] bilingual stage actor cast in the role of Hamlet would not have a right to deliver the soliloquy in Spanish.... [The actor's

use of Spanish] would constitute poor performance, and the employer could properly discipline or discharge a poorly performing employee.

Perea, *English–Only Rules and the Right To Speak One's Primary Language in the Workplace*, 23 J.L.Ref. 265, 299 (1990).