**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**PREMIER OPERATOR SERVICES, INC., Defendant.**

**No. 3:98–CV–198G.**

United States District Court, N.D. Texas, Dallas Division.

Sept. 13, 2000.

---

**9.** Tex. Ins.Code art. 20A, *et seq.* (Vernon 1981 & Supp.2000).

**10.** Tex. Bus. & Com.Code § 17.45, *et seq.* (Vernon 1987 & Supp.2000).

Robert A. Canino, Regional Atty., Toby Wosk Costas, Supervisory Trial Atty., for E.E.O.C.

## FINAL JUDGMENT

STICKNEY, United States Magistrate Judge.

The United States Equal Employment Opportunity Commission ("EEOC") ("Plaintiff"), submitted its evidence by testimony, deposition excerpts, affidavits, exhibits and an expert report to the Court by the time of trial on July 28, 2000. Plaintiff also submitted stipulated facts, and issues of law in the Pretrial Order filed jointly by the parties, and having previously presented evidence to the Court in Response to Defendant's Motion for Summary Judgment on May 13, 1999, this Court issues the final Judgment:

## I. BACKGROUND

Premier Operator Services, Inc. ("Defendant") is properly before the Court. The Court has jurisdiction over the parties and the subject matter. Plaintiff is an agency of the United States charged with the administration, interpretation and enforcement of Title VII of the Civil Rights Act, and is expressly authorized to bring this action by Section 706(a) of Title VII, 42 U.S.C. Section 2000e–5(a). More than 30 days prior to the institution of this lawsuit, Albert Estrada and Francisco Gracia filed timely charges of discrimination with the EEOC alleging a violation of Sections 703(a) and 704(a) of Title VII of the Civil Rights Act of 1964, as amended. Defendant is an employer doing business in DeSoto, Texas. Since approximately August or September 1995, Defendant was an employer engaged in an industry affecting commerce within the meaning of Section 701(b), (g) and (h) of Title VII, 42 U.S.C. Section 2000e(b), (g) and (h).

The Charging Parties and similarly situated aggrieved individuals ("class members") for whom Plaintiff seeks relief are of Hispanic national origin—they or their parents were born in Mexico or another country in which Spanish is the primary or predominant language. The record also shows that the class members are bilingual, typically having learned English through the U.S. school system. Nevertheless, their primary language or language of national origin is Spanish. This is evidenced by the fact that class members were raised primarily speaking Spanish in their homes and with their family members and friends who are sometimes monolingual Spanish speakers.

The class members worked as Operators for Defendant. The recruitment and hiring of the class members was based or conditioned upon their bilingual ability, and in particular, their ability to speak Spanish because of a need for the Defendant's business to service Spanish-speaking customers in connecting long distance telephone calls. The ability to speak Spanish was viewed by Defendant as an asset in conducting its business. In fact, class members were tested at or about the time of hire to ensure their ability to speak and understand Spanish.

Defendant enacted a "Speak–English–Only" policy prohibiting the speaking of Spanish on the company premises. The policy was posted on the door at the entrance of the "DNSI" building in which Defendant was located. This sign specifically warns about Defendant's language policy. The same sign also conspicuously couples the policy with a warning about

weapons, implying a combined concern about the conduct of those persons who speak a language other than English, Hispanic employees in this case, and setting the scene for stigmatization of those to whom the policy is directed:

> "*Absolutely* No Guns, Knives or Weapons of any kind are allowed on these Premises at any time! *English* is the official language of Premier Operator Services, Inc. All conversations on these premises are to be in English. Other languages may be spoken to customers who cannot speak English."

This policy prohibited the speaking of Spanish at all times, including the time during free moments operators had between calls, during lunch, in the employee break room, when making personal telephone calls, and before and after work if inside the building. Under Defendant's policy, the only time it was acceptable to speak Spanish was when assisting a Spanish-speaking customer. Confined to the close quarters of a small work area in which, before the hire of non-Hispanic Operators starting in mid-January 1996, everyone spoke Spanish, Defendant's employees were prohibited from speaking in Spanish to their co-workers at all times. Working shoulder to shoulder, workers experiencing free time between calls, including those persons working on the night shift, were required to speak to their Hispanic colleagues in English or face discipline or dismissal. Lunchroom conversations—even between a Hispanic husband and wife—could not include Spanish words or phrases. Defendant stipulated and thereby admits that it went as far as to plan installation of a public telephone outside of the building, so that Hispanic employees would have to go outside to make personal phone calls during which they might speak Spanish.

On January 16, 1996, Defendant required the class members to sign a memo detailing Defendant's English-only policy as a prerequisite to continued employment. Class members testified and for-

mer Vice President Marvin McCroy admitted that it was understood that if the employees did not agree to the prohibitions imposed by the policy, their employment would be terminated. Indeed, six employees who refused to sign the memo—Edgar Lira, Mardia Lira, Marcella Mendez, Lauren Peralta, Ruth Torres and Lupe Torres—were immediately terminated.

Two employees who signed the memo under protest and then filed EEOC charges of discrimination alleging the policy to be discriminatory—Francisco Gracia and Albert Estrada—were terminated within 24 hours of Defendant's receipt of the charges. Former Vice President McCroy, an eyewitness to the receipt of the charges by Eric Brown, Defendant's President and CEO, testified to a conversation with Brown in which the President ordered the immediate termination of the charging parties, Gracia and Estrada, when he received the notification of the EEOC's federal investigation based on their charges.

Class members who signed the English-only memo under protest or voiced their opposition to the policy were soon "laid off" without notice (Luis Sanchez, Veronica Gomez, Laura Gonzalez, Yvonne Lopez, Veronica Perla). In fact, during a three-month period at the start of 1996, Defendant "laid off", or had "taken off the schedule" (Defendant's euphemisms for discharge terminations) 13 Hispanic employees, while replacing them with 14 non-Hispanic operators. As a practical matter, there is no difference in the nature and finality of the terminations of the class members, regardless of the terms used by the Defendant to characterize their separation of employment. The evidence shows that all of the class members affected were involuntarily terminated.

Expert witness Dr. Susan Berk–Seligson, a professor of linguistics and Hispanic language and culture at the University of Pittsburgh, testified consistent with the findings in her report, and based on exten-

sive research in the field of linguistics that adhering to an English-only requirement is not simply a matter of preference for Hispanics, or other persons who are bilingual speakers, but that such restraint can be virtually impossible in many cases. Bilinguals whose original language is a language other than English unconsciously switch from English to their original or primary language when speaking informally with fellow members of their cultural group. This switching back and forth, formally known as "code switching" can occur in conversation even within a sentence or between sentences. The expert's findings that the class members in this case were subject to code-switching was based not only on her knowledge and research in the field of linguistics, but also on her review of information elicited from the class members.

Credible and persuasive evidence was presented by the expert witness, Dr. Berk–Seligson, regarding research of psycho linguists in the late 1990's, which concludes that code switching cannot typically be "turned off"; and that a person cannot be forced to refrain from uttering a word of the primary language simply upon direction or request, because this switching is, or can be an unconscious act.

Dr. Berk–Seligson further testified, relevant to the facts of this case, that bilingual speakers will generally tend to continue to speak in the language in which they most recently spoke, as in a case where an Operator turns to speak to a fellow worker immediately following a conversation with a Spanish speaking customer. The class members testified as to their automatic continued use of Spanish under these circumstances.

Nonobservance of the English-only policy was not simply a matter of individual preference for the class members. On a daily basis, the Hispanic employees of Defendant were faced with the very real risk of being reprimanded or even losing their jobs if they violated the English-only rule, even if such non-compliance was inadvertent. There was no comparable risk posed by the policy for Defendant's non-Hispanic employees, particularly since they would not have the same tendency to lapse into Spanish inadvertently. In fact, there is no evidence that any person other than an employee of Hispanic national origin was disciplined or terminated for objecting to or violating the English-only policy.

The EEOC presented evidence through its expert witness, Dr. Berke–Seligson, that to deny a bilingual Hispanic the right to alternate between Spanish and English in informal conversations with other Spanish speakers or Hispanics not only makes the individual feel uncomfortable, but is tantamount to intimidating him or her and being punitive with such a constraint.

Insufficient credible evidence has been presented by the Defendant during this litigation, either with the filing of its Motion for Summary Judgment or at the time of trial, to establish by a preponderance of the evidence that there was any business necessity for the speak-English-only policy that was implemented. The policy was not job-related or consistent with any business necessity for the performance of the job duties and functions of the position of Operator with Defendant. To the contrary, the evidence is clear that the speaking of Spanish was a job requirement. Even if the Court were to assume that office "harmony" were properly considered to be a business necessity that would justify an English-only policy, there is no credible or persuasive evidence that there was "discord" amongst Defendant's employees which required harmonization in this manner. Further, there is no evidence that the subject policy and its enforcement promoted "harmony" in the workplace. Quite the opposite, the evidence shows that the policy served to create a disruption in the work place and feelings of alienation and inadequacy by Hispanic employees who had, up until that time, been proven performers for the company. Likewise, there is no evidence sufficient to establish that there was any inability of the employees,

all of whom were bilingual, to communicate with their supervisors and managers, such as Maria Gaytan or Marvin MacCroy, in carrying out their job duties and responsibilities.

Considering the lack of business necessity substantiated by Defendant or supported by the evidence as relates to the specific duties and responsibilities of an Operator position, the blanket application of this policy, at all times throughout the Defendant's premises, including personal time such as lunches and breaks, precludes a finding that there can be a business necessity for this type of policy.

The evidence presented by Plaintiff shows that, regardless of the motivations asserted by the employer, the speak-English-only policy as implemented and enforced by the Defendant was a tool by which discrimination based on national origin was effected. Discriminatory intent supporting a claim of disparate treatment is evidenced not only in the implementation and enforcement of the English-only policy, but also by the manner in which a majority of the Hispanic employees were replaced by an increasing majority of non-Hispanic employees. Evidence of intent is also seen in the pretext of reasons by the employer for instituting the policy, by the company's admitted plan to install a pay phone outside the building to be used by the Hispanics who wished to speak Spanish during their personal phone calls. Testimony of ethnic slurs by the Defendant's President was also presented.

One class member, Marcella Mendez testified, consistent with her affidavit submitted to the Court that when she was reprimanded by the company President, Eric Brown, for speaking Spanish to a co-worker in the lunch room, he cursed at her and told her that if she wouldn't comply with the English only rule, she needed to punch out. At that time he also said to her, "Wetbacks, I wish you would speak where I can understand you." The witness also stated that she recalled that Mr. Brown used the derogatory term "Wet-backs" referring to the Hispanic employees on another occasion.

Testimony of Defendant's former management official, and Vice President, Marvin McCroy, established, by direct evidence, a violation of Title VII's prohibition against retaliation. Mr. McCroy testified that Eric Brown, owner and President of Defendant adamantly required that employees acquiesce to the blanket English-only policy or be terminated. McCroy testified that signing the English only memo signified agreement to the policy as a condition to continued employment. Mr. McCroy also testified that the president expected him to be an "enforcer" of the policy, and that he did enforce it.

Edgar Lira, Mardia Lira, Marcella Mendez, Lauren Peralta and Lupe Torres were terminated because they refused to sign the English-only memo, as evidenced by the termination documents signed by McCroy and submitted as exhibits to the Court. McCroy further testified that when Brown saw the charges filed by two of the employees, he immediately directed McCroy to discharge the charging parties by "taking them off the schedule". With regard to some class members, McCroy was ordered by Brown to write that their terminations were "voluntary" although they were not.

Defendant stipulated that one Charging Party, Francisco Gracia, achieved the third highest call completion rate out of 31 operators during the last pay period before his discharge; and McCroy testified that the other Charging Party, Albert Estrada, was one of Defendant's top performers. Nevertheless, the Defendant's President ordered that backdated disciplinary notices be added to their personnel files, after the fact, to justify their terminations.

McCroy's testimony, as former Vice President and the person who carried out the retaliatory action on behalf of the company within the scope of his employment, serves as direct evidence to establish that, but for the opposition to the policy and the

filing of the charges of discrimination, Estrada and Gracia would not have been terminated.

The EEOC forwarded notice of charges filed by Francisco Gracia and Albert Estrada to Defendant. A date-stamped copy of the Notice of the EEOC charge for Francisco Gracia shows that the charge was received by Defendant on February 29, 1996. Defendant stipulated that the last date of employment for charging parties Gracia and Estrada was on or about February 29, 1996. This evidence of the temporal nexus between receipt of the charge and the terminations further supports a finding of retaliatory discharge.

The class members expressed opposition to unlawful employment practices by any one or more of the following responses: by refusing to sign the English-only memo; by signing the memo under protest; by making negative comments or voicing objections about the English-only policy to management; or by filing charges of discrimination with the EEOC. While some class members received "pink slips" with their late February paychecks, and Defendant claimed there was a decline in business, the evidence shows that non-Hispanics Christopher Petty, Amanda McCroy, Justin Ray and Brandie Geter were hired within the same one-month time period as the "layoff" of Hispanics. Former Vice President McCroy testified that claims by management of a downturn in business from Spanish-speaking customers were not true: the goal was to eliminate the complaining parties from the workforce. This evidence supports this Court's finding that, but for their engaging in statutorily protected activity of opposing what they reasonably believed to be an unlawful employment practice or policy, the class members would not have been terminated.

Back pay plus interest for class member Albert Estrada has been calculated in the amount of $6,451.58. Back pay plus interest for class member Edgar Lira has been calculated in the amount of $3,999.98. Back pay plus interest for class member Mardia Lira has been calculated in the amount of $8,614,67. Back pay plus interest for class member Yvonne Lopez has been calculated in the amount of $12,717.82. Back pay plus interest for class member Ruth Torres has been calculated in the amount of $6,023.79. Back pay plus interest for class member Veronica Gomez has been calculated in the amount of $15,697.47. Back pay plus interest for class member Lauren Peralta has been calculated in the amount of $475.26. Back pay plus interest for class member Luis Sanchez has been calculated in the amount of $5,303.99. There is no evidence that any other class members were due back pay. Thus, total back pay plus interest to which the above-identified class members are entitled is $59,284.56.

Class members have testified at trial and/or provided sworn statements or deposition testimony regarding discrimination. This testimony, combined with the testimony and report of Dr. Berk–Seligson, supports this Court's finding that the imposition of the speak-English-only policy and consequent discipline and discharge caused these mostly young individuals to be embarrassed and humiliated, intimidated, alienated, rejected, and doubtful about their future job prospects.

The evidence established that the implementation and enforcement of the policy, the resulting terminations and the retaliatory reaction by the company to opposition to the policy by employees was all carried out with knowledge, understanding and foresight by the employer, through its President and Vice President, that the actions were unlawful or likely to violate the law. Marvin McCroy testified to the conversation he had with Eric Brown, during which he advised the President against implementation of the policy. The adverse employment actions were committed in some cases after employees had verbally expressed their beliefs and concerns to supervisors or managers that the policy was unlawful.

It is undisputed that with regard to those class members disciplined or discharged on or after February 29, 1996, the employer was acting with notice of the fact that a federal agency, namely the EEOC, had commenced an investigation of charges that the policy was unlawful. Despite the fact that the employer knew of the potential consequences of its conduct, it proceeded to act with reckless disregard to the federally protected rights of the class members.

Furthermore, in a memo to fellow company officials, Eric Brown expressed his intent to fraudulently transfer Defendant's assets in an effort to evade liability in the EEOC's lawsuit. The President of Defendant has shown a pattern of disregard for federal law. Mr. Brown's disregard for the role of the EEOC or the federal government was attested to by Mr. McCroy and is corroborated by pleadings and affidavits of record with the Court showing the efforts by Mr. Brown to evade service by private process servers and even U.S. Marshals. Mr. McCroy testified that Mr. Brown has stated that he would run his business his way without regard to the need to comply with government requirement.

Testimony from class members supports a finding that the imposition of the English-only policy and abrupt terminations of class members resulted in loss of self-esteem, emotional harm, humiliation, loss of enjoyment of life, and inconvenience warranting an award of non-pecuniary compensatory damages as awardable under the Civil Rights Act of 1991.

## II. CONCLUSION OF LAW AND RELIEF AWARDED

 Defendant's enactment and implementation of the speak-English-only rule or policy constitutes disparate treatment of Hispanic employees based upon their national origin, in violation of Title VII of the Civil Rights Act of 1964, as amended. A blanket policy or practice prohibiting the speaking of a language other than English on an employer's premises at all times, except when speaking to a non-English speaking customer, violates Title VII's prohibition against discrimination based on national origin.

The EEOC Guidelines, codified at 29 C.F.R. 1606.7, state that a blanket English-only rule is presumed to violate Title VII:

**A rule requiring employees to speak only English at all times in the work place is a burdensome term and condition of employment. The primary language of an individual is often an essential national origin characteristic. Prohibiting employees at all times, in the workplace, from speaking their primary language or the language they speak most comfortably, disadvantages an individuals's employment opportunities on the basis of national origin. It may also create an atmosphere of inferiority, isolation and intimidation based on national origin which could result in a discriminatory working environment. Therefore, the Commission will presume that such a rule violates Title VII and will closely scrutinize it.**

Speak–English–only rules tend to impact people whose national origin is from non-English speaking countries more heavily than it affects others. *EEOC v. Synchro–Start, Inc.*, 29 F.Supp.2d 911, 914 (N.D.Ill. 1999). While English-only rules may be seen as facially neutral, they disproportionately burden national origin minorities because they preclude many members of these groups from speaking the language in which they are best able to communicate, while rarely, if ever, having that effect on non-minority employees. Blanket English-only rules have a significant adverse impact on national origin groups whose primary language or language of national origin is not English. Further, even a tailored English-only rule must be justified by business necessity, if there is one that could conceivably exist, and in this case there is not.

Congress has agreed with the EEOC's interpretation of Title VII through these Guidelines. In 1991, when discussing the amendment of Title VII to clarify the standard for proving disparate impact discrimination, Congress specifically discussed the EEOC Guidelines regarding English-only rules and chose not to alter them. Senator DeConcini noted that several of his constituents had complained about workplace English-only rules. When he asked Senator Kennedy whether the EEOC Guidelines would remain intact, Senator Kennedy answered that the Guidelines had worked effectively and that the new legislation would not affect them in any way. 137 Cong.Rec. S15,489 (daily ed. Oct. 30, 1991). "An agency interpretation is entitled to greater deference when Congress is aware of the interpretation and chooses not to change it when amending the statute in other respects." *United States v. Rutherford*, 442 U.S. 544, 554, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979).

The two appellate cases addressing the legality of English-only rules involved prohibitions confined to the work area, excluding free time and break areas. In *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1483 (9th Cir.1993), the English-only policy stated: "During lunch, breaks, and employees' own time, [employees] are obviously free to speak Spanish if they wish." The employer in *Spun Steak* eventually issued additional exceptions to its English-only rule. The Fifth Circuit Court of Appeals, in *Garcia v. Gloor*, 618 F.2d 264 (5th Cir. 1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981), specifically excluded from its ruling English-only rules covering employees' personal time.

**Whether or not this argument might have a tenable basis if made on behalf of all employees who are bilingual or if invoked against a rule that forbade all use of any language but English we need not consider ... [Plaintiff] was permitted to speak the language he preferred during work breaks.**

*Gloor*, 618 F.2d at 268. Moreover, *Gloor* was issued before the EEOC Guidelines on English-only rules were adopted; the court noted that the decision was rendered in the absence of any guidance from EEOC regulations. *Id.* at n. 1.

*Gloor* was also decided prior to the extensive research, studies and scientific findings presented through the credible testimony of well-qualified linguistics expert, Dr. Susan Berk–Seligson. Dr. Seligson testified, consistent with her expert reports, regarding "code switching" and the fact that speaking only English is not simply a matter of preference for bilingual persons whose primary language or language of national origin is other than English. Based on the most recent and directly relevant state of research on this subject, it is evident that lapsing or switching from English to Spanish is often inadvertent and unconscious on the part of bilingual Spanish speakers such as the class members in this case.

This case is distinguishable from *Gloor* and *Spun Steak* in its blanket prohibition against the speaking of Spanish, at all times, except if needed to speak to Spanish-speaking customers. The rule in this case covered conversations during lunch, on breaks and other personal time while the employee was in the employer's building or on the premises.

Discrimination in the context of disparate impact involves facially neutral policies that affect a class of persons protected by Title VII more harshly than other employees. *Intl. Brotherhood of Teamsters v. U.S.*, 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). In disparate impact cases, the plaintiff need not prove the employer's intent to discriminate. *Griggs v. Duke Power Co.*, 401 U.S. 424, 430, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Under the 1991 Amendments to Title VII, an unlawful employment practice based upon disparate impact is established if the plaintiff shows that the employer uses a particular employment practice that causes a disparate impact on a protected group.

The burden then shifts to the employer to demonstrate a legitimate "business necessity" for the practice. If the employer demonstrates a business necessity for the practice, the burden then shifts back to plaintiff to prove that the employer could have used other non-discriminatory means to satisfy the same business necessity. 42 U.S.C. § 2000e–2(k).

The ruling in *Gloor* was based on a presumption, that because the plaintiff was "fully bilingual," he could "readily comply" with the English-only rule; and that his use of Spanish was simply a matter of "individual preference." It was on this basis that the court in the *Gloor* case concluded that the employer's English-only policy did not have an adverse impact. *Gloor*, 618 F.2d at 270. With regard to the disparate impact theory of discrimination forwarded by the Plaintiff in this case, a preponderance of credible evidence has been presented that linguistic experts and legal scholars have analyzed the impact of English-only policies as follows:

> **Since bilingual individuals usually engage in code-switching inadvertently, ... they may often be subject to reprimand and adverse employment decisions when attempting to communicate in an "English-only" workplace. Under these circumstances, the bilingual individual's use of his ... primary language is not a matter of personal preference.**

Lisa L. Behm, "Protecting Linguistic Minorities Under Title VII: The Need for Judicial Deference to the EEOC Guidelines on Discrimination Because of National Origin," 81 Marq.L.Rev. 569, 595 (Winter 1998).

The Court in *Spun Steak* focused on the physical difficulty of complying with an English-only rule, rather than on the discriminatory impact of that rule. Yet, as Judge Reinhardt wrote in his dissent in the denial of rehearing in *Spun Steak*, history reveals that "[s]ome of the most objectionable discriminatory rules are the least obtrusive in terms of one's ability to comply: being required to sit in the back of the bus for example." *Garcia v. Spun Steak Co.*, 13 F.3d 296, 298 (9th Cir.1993). Under this analysis, a black employee could not challenge a rule requiring the use of separate bathrooms and drinking rooms; an Orthodox Jew could not challenge a rule forbidding the wearing of head coverings. The ease of compliance with a rule should not be the measure of its discriminatory effect.

EEOC Guidelines have recently been followed in *EEOC*, 29 F.Supp.2d at 914. The Court followed the presumption in the EEOC Guidelines that "... English-only rules may 'create an atmosphere of inferiority, isolation and intimidation based on national origin which could result in a discriminatory working environment.'" *EEOC*, 29 F.Supp.2d at 915. In ruling against the employer's motion to dismiss, the Court relied on the EEOC Guidelines to uphold the EEOC's Title VII claims. The *EEOC* English-only rule applied only during working hours, affecting employees who were of Hispanic and Polish descent and who spoke limited English. The court found that the EEOC's complaint with regard to these employees "plainly" stated a viable claim.

Defendant's employees who did not speak Spanish, and who were not of Hispanic national origin, were not subject to the same oppressive monitoring or potential discipline and discharge as were the Hispanic employees. The Hispanic class members were forced to be constantly on guard to avoid uttering their native language, even in their most private moments in the lunch room or on a break. Nevertheless, as testified by class members including Mardia Lira, once reprimanded for speaking in Spanish to her husband while at lunch in the break room, the policy was strictly enforced. Since the family members of Hispanic employees in most cases speak primarily Spanish or are monolingual, the requirement that all employees speak only English adversely impacted Hispanic employees who sometimes need-

ed to make personal calls to home. The non-Hispanic employees did not similarly risk inadvertently switching to Spanish and the discipline or discharge that could and did result. This difference in working conditions not only constitutes disparate treatment, but also demonstrates the disparate impact of the policy on a protected class of employees, persons of Mexican or other Hispanic national origins.

Defendant subjected the class members to disparate treatment with regard to their terms and conditions of employment by imposing and enforcing the speak-English-only policy. Defendant discriminated against the class members by terminating them from the position of Operator based upon their national origin, Hispanic, in violation of Section 703(a) of Title VII. Defendant also terminated class members in violation of Section 704(a) of Title VII when the employees opposed defendant's English-only policy which they reasonably believed to be discriminatory under the law.

■ Defendant terminated Francisco Gracia and Albert Estrada because they filed EEOC charges of discrimination and otherwise opposed what they reasonably believed to be unlawful employment practices, in violation of Title VII. To establish a case of retaliation in this jurisdiction, the plaintiff must show that: (1) the employee engaged in a statutorily protected activity by opposing what he/she reasonably believed to be an unlawful employment practice; (2) an adverse action was taken against the employee; and (3) there existed a causal connection in that, but for the protected activity, the employer would not have taken the adverse action. *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir.1995); *see Jack v. Texaco Research Ctr.*, 743 F.2d 1129, 1131 (5th Cir.1984). Timing between the protected activity and the adverse action is an important factor. *See, Shirley v. Chrysler First, Inc.*, 970 F.2d 39 (5th Cir.1992).

■ To establish retaliation under Title VII's "opposition" clause, the test is whether the employee had at least a " 'reasonable belief' " that the practice opposed was unlawful, not whether the practice legally or factually constituted a violation of Title VII. *Long v. Eastfield College*, 88 F.3d 300, 306 (5th Cir.1996); *citing Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir.1981). The Hispanic class members in this case opposed Defendant's English-only policy by either openly refusing to sign the policy, signing it under protest, or articulating their objections in opposition to what they reasonably believed to be against their rights as employees. They testified that they found it disturbing that they were hired for their Spanish-speaking capability in handling customers, but then banned from speaking Spanish for any other reason at the risk of being subjected to punishment as if speaking Spanish was tantamount to misconduct. Witness Albert Estrada testified that when he spoke to others about his discomfort with the policy and opposition to it, he was advised by his high school teacher at a law magnate school to seek help from the EEOC. The EEOC accepted the charge for investigation, assigning credibility to Mr. Estrada's concerns.

■ Title VII provides for the imposition of punitive damages in intentional discrimination cases if an employer acts with malice or reckless indifference to an employee's rights. 42 U.S.C. § 1981a(b)(1). The preponderance of the evidence of record supports a conclusion that the motivation for the creation of the policy and the manner of its enforcement, when combined with other evidence of intent, including ethnic slurs by the President and CEO, leads to a finding of disparate treatment against a class of Hispanic employees. Having established intentional violations of Title VII to include intentional violations of disparate treatment and retaliation, the class members represented by the EEOC are eligible for an award of compensatory

and punitive damages under the Civil Rights Act of 1991.

It is Defendant who must carry the burden of introducing evidence of net worth if Defendant wishes these facts to be considered in awarding punitive damages. There is no evidence presented by the Defendant to meet its burden on this point. *Woods–Drake v. Lundy,* 667 F.2d 1198, 1203, n. 9 (5th Cir.1982). Further, despite the fact that Defendant has been through bankruptcy proceedings, there is evidence of record that the President of Defendant has attempted to transfer assets with the purpose of defrauding the government and avoiding the satisfaction of any judgment in favor of the EEOC. There is further evidence, according to the testimony of the former Vice President of the company, that there may be at least one potential successor employer by which the Defendant and/or its President Mr. Brown could continue to conduct business in the field of telecommunications. Therefore, the bankruptcy proceedings which have been closed with regard to Defendant do not preclude this Court from assessing compensatory and punitive damages to be enforced against any appropriate company or entity deemed to be a successor at a later date.

One important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. *BMW v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809. In a recent Title VII retaliation case, the Fifth Circuit Court of Appeals ruled that the finding that a university dean expressly acknowledged that he based what should have been a performance-based employment decision instead on an employee's exercise of his federal rights was sufficient to demonstrate a high degree of reprehensibility under *BMW. Rubinstein v. Admin. of Tulane Educ. Fd.,* 2000 WL 898050 (5th Cir.2000).

For the reasons set forth in under the above Findings of Fact, Defendant's conduct, through its managing officers, constituted a reckless disregard for the law and the federally protected rights of the aggrieved individuals. As a result, punitive damages are appropriate. Each class member named in this suit is entitled to punitive damages regardless of whether he or she is to recover back pay damages.

With regard to an assessment of a punitive damage award, it is settled that for the Defendant's intentional acts of disparate treatment and retaliation, the terms "malice" and "reckless indifference" pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination. *Kolstad v. American Dental Association,* 527 U.S. 526, 119 S.Ct. 2118, 2124, 144 L.Ed.2d 494 (1999). There is ample evidence here that the Defendant, through its chief managing officer, acted with the requisite intent to support an award for punitive damages.

Plaintiff is entitled to injunctive relief, enjoining Defendant, or any successor thereto, from enacting any policy in the future that prohibits the speaking of a language other than English at all times at the workplace. Furthermore, Plaintiff is entitled to injunctive relief, enjoining Defendant, or any successor thereto, from enacting any policy in the future that discriminates against employees based upon their national origin. Plaintiff is entitled to injunctive relief, enjoining defendant, or any successor thereto, from retaliating against employees who file charges of discrimination or oppose practices made unlawful under Title VII.

Albert Estrada is entitled to back pay plus interest in the amount of $6,451.58. Edgar Lira is entitled to back pay plus interest in the amount of $3,999.98. Mardia Lira is entitled to back pay plus interest in the amount of $8,614.67. Yvonne Lopez is entitled to back pay plus interest in the amount of $12,717.82. Ruth Torres is entitled to back pay plus interest in the amount of $6,023.79. Veronica Gomez is entitled to back pay plus interest in the

amount of $15,697.47. Lauren Peralta is entitled to back pay plus interest in the amount of $475.26. Luis Sanchez is entitled to back pay plus interest in the amount of $5,303.99. Total back pay plus interest due to the class members entitled to back pay amounts to $59,284.56.

Defendant's explicit intent to discharge employees who opposed what they reasonably believed to be unlawful employment practices, and the President's stated decision to terminate employees for filing EEOC charges, followed by instructions to add backdated reprimands into the charging parties' files, demonstrates a reckless disregard for employees' federally protected rights. Defendant's decision to terminate employees who opposed the English-only policy after receiving notice of an EEOC charges of discrimination alleging that the policy violates Title VII, constitutes reckless disregard for the employees' federally protected rights. Defendant's President's decision to enforce the English only policy despite the expressed concerns of a fellow officer that the policy violated federal law constitutes reckless disregard for the employees' federally protected rights.

Testimony from class members supports a finding that the imposition of the English-only policy and abrupt terminations of class members resulted in loss of self-esteem, emotional harm, humiliation, loss of enjoyment of life, and inconvenience warranting an award of non-pecuniary compensatory damages as awardable under the Civil Rights Act of 1991.

The Plaintiff, on behalf of the 13 terminated class members, is entitled to a judgment of $50,000 in compensatory and punitive damages as to each person, in amounts to be allocated and assigned by the Court to each component of the damages, as appropriate, for a total of $650,000.00.