Priscilla GARCIA; Maricela Buitrago; United Food and Commercial Workers International Union, AFL–CIO, Plaintiffs–Appellees,

v.

SPUN STEAK COMPANY, a California corporation, Defendant–Appellant.

No. 91–16733.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 3, 1992.

Decided July 16, 1993.

James A. Carter, Hendrickson, Higbie & Carter, San Francisco, CA, for defendant-appellant.

Edward M. Chen, American Civil Liberties Union Foundation of Northern California, San Francisco, CA, for plaintiffs-appellees.

Jennifer S. Goldstein, E.E.O.C., Washington, DC, for amicus.

Before: BOOCHEVER, NOONAN and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We are called upon to decide whether an employer violates Title VII of the Civil Rights Act of 1964 in requiring its bilingual workers to speak only English while working on the job.

I

Spun Steak Company ("Spun Steak") is a California corporation that produces poultry and meat products in South San Francisco for wholesale distribution. Spun Steak employs thirty-three workers, twenty-four of whom are Spanish-speaking. Virtually all of the Spanish-speaking employees are Hispanic. While two employees speak no English, the others have varying degrees of proficiency in English. Spun Steak has never required job applicants to speak or to understand English as a condition of employment.

Approximately two-thirds of Spun Steak's employees are production line workers or otherwise involved in the production process. Appellees Garcia and Buitrago are production line workers; they stand before a conveyor belt, remove poultry or other meat products from the belt and place the product into cases or trays for resale. Their work is done individually. Both Garcia and Buitrago are fully bilingual, speaking both English and Spanish.

Appellee Local 115, United Food and Commercial Workers International Union, AFL–CIO ("Local 115"), is the collective bargaining agent representing the employees at Spun Steak.

Prior to September 1990, these Spun Steak employees spoke Spanish freely to their co-workers during work hours. After receiving complaints that some workers were using their bilingual capabilities to harass and to insult other workers in a language they could not understand, Spun Steak began to investigate the possibility of requiring its employees to speak only English in the workplace. Specifically, Spun Steak received complaints that Garcia and Buitrago made derogatory, racist comments in Spanish about two co-workers, one of whom is African–American and the other Chinese–American.

The company's president, Kenneth Bertelson, concluded that an English-only rule would promote racial harmony in the workplace. In addition, he concluded that the English-only rule would enhance worker safety because some employees who did not understand Spanish claimed that the use of Spanish distracted them while they were operating machinery, and would enhance product quality because the U.S.D.A. inspector in the plant spoke only English and thus could not understand if a product-related concern was raised in Spanish. Accordingly, the following rule was adopted:

> [I]t is hereafter the policy of this Company that only English will be spoken in connection with work. During lunch, breaks, and employees' own time, they are obviously free to speak Spanish if they wish. However, we urge all of you not to use your fluency in Spanish in a fashion which may lead other employees to suffer humiliation.

In addition to the English-only policy, Spun Steak adopted a rule forbidding offensive racial, sexual, or personal remarks of any kind.

It is unclear from the record whether Spun Steak strictly enforced the English-only rule. According to the plaintiffs-appellees, some workers continued to speak Spanish without incident. Spun Steak issued written exceptions to the policy allowing its clean-up crew to speak Spanish, allowing its foreman to speak Spanish, and authorizing certain workers to speak Spanish to the foreman at the foreman's discretion. One of the two employees who speak only Spanish is a member of the clean-up crew and thus is unaffected by the policy.

In November 1990, Garcia and Buitrago received warning letters for speaking Spanish during working hours. For approximately two months thereafter, they were not permitted to work next to each other. Local 115 protested the English-only policy and requested that it be rescinded but to no avail.

On May 6, 1991, Garcia, Buitrago, and Local 115 filed charges of discrimination against Spun Steak with the U.S. Equal Employment Opportunity Commission ("EEOC"). The EEOC conducted an investigation and determined that "there is rea-

sonable cause to believe [Spun Steak] violated Title VII of the Civil Rights Act of 1964, as amended, with respect to its adoption of an English-only rule and with respect to retaliation when [Garcia, Buitrago, and Local 115] complained."

Garcia, Buitrago, and Local 115, on behalf of all Spanish-speaking employees of Spun Steak, (collectively, "the Spanish-speaking employees") filed suit, alleging that the English-only policy violated Title VII. On September 6, 1991, the parties filed cross-motions for summary judgment. The district court denied Spun Steak's motion and granted the Spanish-speaking employees' motion for summary judgment, concluding that the English-only policy disparately impacted Hispanic workers without sufficient business justification, and thus violated Title VII. Spun Steak filed this timely appeal and the EEOC filed a brief amicus curiae and participated in oral argument.

## II

As a preliminary matter, we must consider whether Local 115 has standing to sue on behalf of the Spanish-speaking employees at Spun Steak. If Local 115 does not have standing, we will consider the application of the policy only to Garcia and Buitrago, both of whom speak English fluently.

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

Here, it is clear that the Spanish-speaking employees would have standing to sue in their own right because they could claim injury from the application of the policy to them. Further, it is clear that the employees' interest in the conditions of the workplace is germane to Local 115's purpose as the collective bargaining agent of the employees. Finally, the claim asserted and the

relief requested do not require the participation of individual members. Local 115 claims that the policy has a per se discriminatory impact on all Spanish-speaking employees. Further, the union is seeking only injunctive relief on behalf of its members, not damages.

In short, Local 115 has standing.

## III

Sections 703(a)(1) and (2) of Title VII provide:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). It is well-settled that Title VII is concerned not only with intentional discrimination, but also with employment practices and policies that lead to disparities in the treatment of classes of workers. *See, e.g., Griggs v. Duke Power Co.,* 401 U.S. 424, 430–31, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1970). Thus, a plaintiff alleging discrimination under Title VII may proceed under two theories of liability: disparate treatment or disparate impact. *Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 986–87, 108 S.Ct. 2777, 2784–85, 101 L.Ed.2d 827 (1987). While the disparate treatment theory requires proof of discriminatory intent, intent is irrelevant to a disparate impact theory. *Id.* at 988, 108 S.Ct. at 2785. "[I]mpact analysis is designed to implement Congressional concern with 'the consequences of employment practices, not simply the motivation.'" *Rose v. Wells Fargo &*

*Co.*, 902 F.2d 1417, 1424 (9th Cir.1990) (citations omitted).

### A

The Spanish-speaking employees do not contend that Spun Steak intentionally discriminated against them in enacting the English-only policy. Rather, they contend that the policy had a discriminatory impact on them because it imposes a burdensome term or condition of employment exclusively upon Hispanic workers and denies them a privilege of employment that non-Spanish-speaking workers enjoy. Because their claim focuses on disparities in the terms, conditions, and privileges of employment, and not on barriers to hiring or promotion, it is outside the mainstream of disparate impact cases decided thus far. As a threshold matter, therefore, we must determine whether the disparate impact theory can be made applicable at all.

The disparate impact cause of action developed out of the language in section 703(a)(2) prohibiting discrimination based on deprivation of employment opportunities, such as the opportunity to be hired or promoted. *See, e.g., Connecticut v. Teal*, 457 U.S. 440, 448–50, 102 S.Ct. 2525, 2531–32, 73 L.Ed.2d 130 (1981). Our court's disparate impact cases fall squarely within the language of section 703(a)(2). The cases in which we have concluded that the plaintiff has proved discrimination based on a disparate impact theory have all involved plaintiffs who claimed that they were denied employment opportunities as the result of artificial, arbitrary, and unnecessary barriers that excluded members of a protected group from being hired or promoted, *see, e.g., Bouman v. Block*, 940 F.2d 1211, 1224–26 (9th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991), not plaintiffs contending that they were subjected to harsher working conditions than the general employee population.

■ This case, by contrast, does not fall within the language of section 703(a)(2). While policies that serve as barriers to hiring or promotion clearly deprive applicants of employment opportunities, we cannot conclude that a burdensome term or condition of employment or the denial of a privilege would "limit, segregate, or classify" employees in a way that would "deprive any individual of employment opportunities" or "otherwise adversely affect his status as an employee" in violation of section 703(a)(2). *See Nashville Gas Co. v. Satty*, 434 U.S. 136, 144, 98 S.Ct. 347, 352, 54 L.Ed.2d 356 (1977) (deprivation of benefits does not fall under § 703(a)(2)). Such claims, therefore, must be brought directly under section 703(a)(1). We have never expressly considered, however, whether disparate impact theory applies to claims under section 703(a)(1), and the Supreme Court has explicitly reserved the issue. *Id.*

■ Nevertheless, we are called upon to decide the issue in this case notwithstanding the parties' failure to brief it. Our decision is simple: we see no reason to restrict the application of the disparate impact theory to the denial of employment opportunities under section 703(a)(2). The Supreme Court has instructed that the language of section 703(a)(1) is to be interpreted broadly. "[T]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment," *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1985) (internal quotations and citations omitted), even when the differences in treatment are not the result of intentional discrimination. *See also Lynch v. Freeman*, 817 F.2d 380, 387 (6th Cir.1987) ("The language of section 703(a)(2) is ... broad enough to include working conditions that have an adverse impact on a protected group of employees."). Regardless whether a company's decisions about whom to hire or to promote are infected with discrimination, policies or practices that impose significantly harsher burdens on a protected group than on the employee population in general may operate as barriers to equality in the workplace and, if unsupported by a business justification, may be considered "discriminatory." *Id.; cf. Meritor Sav. Bank*, 477 U.S. at 57, 106 S.Ct. at 2399 (sexual harassment can be arbitrary barrier to equality in the marketplace). We are satisfied that a disparate impact claim may be based upon a challenge to a practice or policy that has a significant

adverse impact on the "terms, conditions, or privileges" of the employment of a protected group under section 703(a)(1).

### B

■ To make out a prima facie case of discriminatory impact, a plaintiff must identify a specific, seemingly neutral practice or policy that has a significantly adverse impact on persons of a protected class. *Teal,* 457 U.S. at 446, 102 S.Ct. at 2530. If the prima facie case is established, the burden shifts to the employer to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C.A. § 2000e–2(k)(1)(A) (Supp.1992). In this case, the district court granted summary judgment in favor of the Spanish-speaking employees, concluding that, as a matter of law, the employees had made out the prima facie case and the justifications offered by the employer were inadequate.

### 1

■ We first consider whether the Spanish-speaking employees have made out the prima facie case. "[T]he requirements of a prima facie disparate impact case ... are in some respects more exacting than those of a disparate treatment case." *Spaulding v. University of Washington,* 740 F.2d 686, 705 (9th Cir.) (citation omitted), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984). In the disparate treatment context, a plaintiff can make out a prima facie case merely by presenting evidence sufficient to give rise to an inference of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–06, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668 (1973). In a disparate impact case, by contrast, plaintiffs must do more than merely raise an inference of discrimination before the burden shifts; they "must actually prove the discriminatory impact at issue." *Rose,* 902 F.2d at 1421. In the typical disparate impact case, in which the plaintiff argues that a selection criterion excludes protected applicants from jobs or promotions, the plaintiff proves discriminatory impact by showing statistical disparities between the number of protected class members in the qualified applicant group and

those in the relevant segment of the workforce. *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 650, 109 S.Ct. 2115, 2121, 104 L.Ed.2d 733 (1988). While such statistics are often difficult to compile, whether the protected group has been disadvantaged turns on quantifiable data. When the alleged disparate impact is on the conditions, terms, or privileges of employment, however, determining whether the protected group has been adversely affected may depend on subjective factors not easily quantified. The fact that the alleged effects are subjective, however, does not relieve the plaintiff of the burden of proving disparate impact. The plaintiff may not merely assert that the policy has harmed members of the group to which he or she belongs. Instead, the plaintiff must prove the existence of adverse effects of the policy, must prove that the impact of the policy is on terms, conditions, or privileges of employment of the protected class, must prove that the adverse effects are significant, and must prove that the employee population in general is not affected by the policy to the same degree.

It is beyond dispute that, in this case, if the English-only policy causes any adverse effects, those effects will be suffered disproportionately by those of Hispanic origin. The vast majority of those workers at Spun Steak who speak a language other than English—and virtually all those employees for whom English is not a first language—are Hispanic. It is of no consequence that not all Hispanic employees of Spun Steak speak Spanish; nor is it relevant that some non-Hispanic workers may speak Spanish. If the adverse effects are proved, it is enough under Title VII that Hispanics are disproportionately impacted.

■ The crux of the dispute between Spun Steak and the Spanish-speaking employees, however, is not over whether Hispanic workers will disproportionately bear any adverse effects of the policy; rather, the dispute centers on whether the policy causes any adverse effects at all, and if it does, whether the effects are significant. The Spanish-speaking employees argue that the policy adversely affects them in the following ways: (1) it denies them the ability to ex-

press their cultural heritage on the job; (2) it denies them a privilege of employment that is enjoyed by monolingual speakers of English; and (3) it creates an atmosphere of inferiority, isolation, and intimidation. We discuss each of these contentions in turn.[1]

a

■ The employees argue that denying them the ability to speak Spanish on the job denies them the right to cultural expression. It cannot be gainsaid that an individual's primary language can be an important link to his ethnic culture and identity. Title VII, however, does not protect the ability of workers to express their cultural heritage at the workplace. Title VII is concerned only with disparities in the treatment of workers; it does not confer substantive privileges. *See, e.g., Garcia v. Gloor,* 618 F.2d 264, 269 (5th Cir.1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 923, 66 L.Ed.2d 842 (1981). It is axiomatic that an employee must often sacrifice individual self-expression during working hours. Just as a private employer is not required to allow other types of self-expression, there is nothing in Title VII which requires an employer to allow employees to express their cultural identity.

b

Next, the Spanish-speaking employees argue that the English-only policy has a disparate impact on them because it deprives them of a privilege given by the employer to native-English speakers: the ability to converse on the job in the language with which they feel most comfortable. It is undisputed that Spun Steak allows its employees to converse on the job. The ability to converse—especially to make small talk—is a privilege of employment, and may in fact be a significant privilege of employment in an assembly-line job. It is inaccurate, however, to describe the privilege as broadly as the Spanish-speaking employees urge us to do.

The employees have attempted to define the privilege as the ability to speak in the language of their choice. A privilege, however, is by definition given at the employer's discretion; an employer has the right to define its contours. Thus, an employer may allow employees to converse on the job, but only during certain times of the day or during the performance of certain tasks. The employer may proscribe certain topics as inappropriate during working hours or may even forbid the use of certain words, such as profanity.

Here, as is its prerogative, the employer has defined the privilege narrowly. When the privilege is defined at its narrowest (as merely the ability to speak on the job), we cannot conclude that those employees fluent in both English and Spanish are adversely impacted by the policy. Because they are able to speak English, bilingual employees can engage in conversation on the job. It is axiomatic that "the language a person who is multi-lingual elects to speak at a particular time is ... a matter of choice." *Garcia,* 618 F.2d at 270. The bilingual employee can readily comply with the English-only rule and still enjoy the privilege of speaking on the job. "There is no disparate impact" with respect to a privilege of employment "if the rule is one that the affected employee can readily observe and nonobservance is a matter of individual preference." *Id.*

This analysis is consistent with our decision in *Jurado v. Eleven–Fifty Corporation,* 813 F.2d 1406, 1412 (9th Cir.1987). In *Jurado,* a bilingual disc jockey was fired for disobeying a rule forbidding him from using an occasional Spanish word or phrase on the air. We concluded that Jurado's disparate impact claim failed "because Jurado was fluently bilingual and could easily comply with the order" and thus could not have been adversely affected. *Id.*

■ The Spanish-speaking employees argue that fully bilingual employees are hampered in the enjoyment of the privilege be-

---

**1.** The Spanish-speaking employees rely on the reasoning in *Gutierrez v. Municipal Court,* 838 F.2d 1031 (9th Cir.1988), *vacated as moot,* 490 U.S. 1016, 109 S.Ct. 1736, 104 L.Ed.2d 174 (1989), which held that English-only policies adversely impact Spanish-speaking employees. The case has no precedential authority, however, because it was vacated as moot by the Supreme Court. We are in no way bound by its reasoning.

**1488**

cause for them, switching from one language to another is not fully volitional. Whether a bilingual speaker can control which language is used in a given circumstance is a factual issue that cannot be resolved at the summary judgment stage. However, we fail to see the relevance of the assertion, even assuming that it can be proved. Title VII is not meant to protect against rules that merely inconvenience some employees, even if the inconvenience falls regularly on a protected class. Rather, Title VII protects against only those policies that have a *significant* impact. The fact that an employee may have to catch himself or herself from occasionally slipping into Spanish does not impose a burden significant enough to amount to the denial of equal opportunity. This is not a case in which the employees have alleged that the company is enforcing the policy in such a way as to impose penalties for minor slips of the tongue. The fact that a bilingual employee may, on occasion, unconsciously substitute a Spanish word in the place of an English one does not override our conclusion that the bilingual employee can easily comply with the rule. In short, we conclude that a bilingual employee is not denied a privilege of employment by the English-only policy.

By contrast, non-English speakers cannot enjoy the privilege of conversing on the job if conversation is limited to a language they cannot speak. As applied "[t]o a person who speaks only one tongue or to a person who has difficulty using another language than the one spoken in his home," an English-only rule might well have an adverse impact. *Garcia*, 618 F.2d at 270. Indeed, counsel for Spun Steak conceded at oral argument that the policy would have an adverse impact on an employee unable to speak English. There is only one employee at Spun Steak affected by the policy who is unable to speak any English. Even with regard to her, however, summary judgment was improper because a genuine issue of material fact exists as to whether she has been adversely affected by the policy. She stated in her deposition that she was not bothered by the rule because she preferred not to make small talk on the job, but rather preferred to work in peace. Furthermore, there is some evidence suggesting that she is

not required to comply with the policy when she chooses to speak. For example, she is allowed to speak Spanish to her supervisor. Remand is necessary to determine whether she has suffered adverse effects from the policy. It is unclear from the record whether there are any other employees who have such limited proficiency in English that they are effectively denied the privilege of speaking on the job. Whether an employee speaks such little English as to be effectively denied the privilege is a question of fact for which summary judgment is improper.

c

Finally, the Spanish-speaking employees argue that the policy creates an atmosphere of inferiority, isolation, and intimidation. Under this theory, the employees do not assert that the policy directly affects a term, condition, or privilege of employment. Instead, the argument must be that the policy causes the work environment to become infused with ethnic tensions. The tense environment, the argument goes, itself amounts to a condition of employment.

i

The Supreme Court in *Meritor Savings Bank v. Vinson*, 477 U.S. at 66, 106 S.Ct. at 2405, held that an abusive work environment may, in some circumstances, amount to a condition of employment giving rise to a violation of Title VII. The Court quoted with approval the decision in *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972):

> [T]he phrase 'terms, conditions or privileges of employment' in [Title VII] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination.... One can readily envision working environments so heavily polluted with discrimination as to destroy completely the emotional and psychological stability of minority group workers.

Although *Vinson* is a sexual harassment case in which the individual incidents involved behavior that was arguably intentionally discriminatory, its rationale applies equally to

cases in which seemingly neutral policies of a company infuse the atmosphere of the workplace with discrimination. The *Vinson* Court emphasized, however, that discriminatory practices must be pervasive before an employee has a Title VII claim under a hostile environment theory.

Here, the employees urge us to adopt a per se rule that English-only policies always infect the working environment to such a degree as to amount to a hostile or abusive work environment. This we cannot do. Whether a working environment is infused with discrimination is a factual question, one for which a per se rule is particularly inappropriate. The dynamics of an individual workplace are enormously complex; we cannot conclude, as a matter of law, that the introduction of an English-only policy, in every workplace, will always have the same effect.

The Spanish-speaking employees in this case have presented no evidence other than conclusory statements that the policy has contributed to an atmosphere of "isolation, inferiority or intimidation." The bilingual employees are able to comply with the rule, and there is no evidence to show that the atmosphere at Spun Steak in general is infused with hostility toward Hispanic workers. Indeed, there is substantial evidence in the record demonstrating that the policy was enacted to prevent the employees from intentionally using their fluency in Spanish to isolate and to intimidate members of other ethnic groups. In light of the specific factual context of this case, we conclude that the bilingual employees have not raised a genuine issue of material fact that the effect is so pronounced as to amount to a hostile environment. *See generally Anderson v. Liberty Lobby,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

ii

■ We do not foreclose the prospect that in some circumstances English-only rules can exacerbate existing tensions, or, when combined with other discriminatory behavior, contribute to an overall environment of discrimination. Likewise, we can envision a case in which such rules are enforced in such a draconian manner that the enforcement itself amounts to harassment. In evaluating such a claim, however, a court must look to the totality of the circumstances in the particular factual context in which the claim arises.

■ In holding that the enactment of an English-only while working policy does not inexorably lead to an abusive environment for those whose primary language is not English, we reach a conclusion opposite to the EEOC's long standing position. The EEOC Guidelines provide that an employee meets the prima facie case in a disparate impact cause of action merely by proving the existence of the English-only policy. *See* 29 C.F.R. § 1606.7(a) & (b) (1991). Under the EEOC's scheme, an employer must always provide a business justification for such a rule. *Id.* The EEOC enacted this scheme in part because of its conclusion that English-only rules may "create an atmosphere of inferiority, isolation and intimidation based on national origin which could result in a discriminatory working environment." 29 C.F.R. § 1606.7(a).

We do not reject the English-only rule Guideline lightly. We recognize that "as an administrative interpretation of the Act by the enforcing agency, these Guidelines ... constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Sav. Bank,* 477 U.S. 57 at 65, 106 S.Ct. 2399 at 2404 (internal quotations and citations omitted). But we are not bound by the Guidelines. *See Espinoza v. Farah Mfg. Co., Inc.,* 414 U.S. 86, 94, 94 S.Ct. 334, 339, 38 L.Ed.2d 287 (1973). We will not defer to "an administrative construction of a statute where there are 'compelling indications that it is wrong.'" *Id.*

We have been impressed by Judge Rubin's pre-Guidelines analysis for the Fifth Circuit in *Garcia,* which we follow today. *Garcia,* 618 F.2d 264. Nothing in the plain language of section 703(a)(1) supports EEOC's English-only rule Guideline. "Title VII could not have been enacted into law without substantial support from legislators in both Houses who traditionally resisted federal regulation of private business." *United Steelworkers of America, AFL–CIO v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). "Those legislators demanded as a price for their support that," *id.,*

management prerogatives, and union freedoms are to be left undisturbed to the greatest extent possible. Internal affairs of employers and labor organizations must not be interfered with except to the limited extent that correction is required in discrimination practices.

Statement of William M. McCulloch, *et al.,* H.R.Rep. No. 914, 88 Cong., 2d Sess (1964), *reprinted in* 1964 U.S.C.C.A.N. 2355, 2516 (quoted in part in *Steelworkers,* 443 U.S. at 206, 99 S.Ct. at 2728). It is clear that Congress intended a balance to be struck in preventing discrimination and preserving the independence of the employer. In striking that balance, the Supreme Court has held that a plaintiff in a disparate impact case must prove the alleged discriminatory effect before the burden shifts to the employer. The EEOC Guideline at issue here contravenes that policy by presuming that an English-only policy has a disparate impact in the absence of proof. We are not aware of, nor has counsel shown us, anything in the legislative history to Title VII that indicates that English-only policies are to be presumed discriminatory. Indeed, nowhere in the legislative history is there a discussion of English-only policies at all.

### 2

Because the bilingual employees have failed to make out a prima facie case, we need not consider the business justifications offered for the policy as applied to them. On remand, if Local 115 is able to make out a prima facie case with regard to employees with limited proficiency in English, the district court could then consider any business justification offered by Spun Steak.

### IV

In sum, we conclude that the bilingual employees have not made out a prima facie case and that Spun Steak has not violated Title VII in adopting an English-only rule as to them. Thus, we reverse the grant of summary judgment in favor of Garcia, Buitrago, and Local 115 to the extent it represents the bilingual employees, and remand with instructions to grant summary judgment in favor of Spun Steak on their claims. A genuine issue of material fact exists as to whether there are one or more employees represented by Local 115 with limited proficiency in English who were adversely impacted by the policy. As to such employee or employees, we reverse the grant of summary judgment in favor of Local 115, and remand for further proceedings.

REVERSED and REMANDED.

BOOCHEVER, Circuit Judge, dissenting in part:

I agree with most of the majority's carefully crafted opinion. I dissent, however, from the majority's rejection of the EEOC guidelines. The guidelines provide that an employee establishes a prima facie case in a disparate impact claim by proving the existence of an English-only policy, thereby shifting the burden to the employer to show a business necessity for the rule. *See* 29 C.F.R. § 1606.7(b) (1991) ("An employer may have a rule requiring that employees speak only in English at certain times where the employer can show that the rule is justified by business necessity."). I would defer to the Commission's expertise in construing the Act, by virtue of which it concluded that English-only rules may "create an atmosphere of inferiority, isolation and intimidation based on national origin which could result in a discriminatory working environment." *Id.* § 1606.7(a).

As the majority indicates, proof of such an effect of English-only rules requires analysis of subjective factors. It is hard to envision how the burden of proving such an effect would be met other than by conclusory self-serving statements of the Spanish-speaking employees or possibly by expert testimony of psychologists. The difficulty of meeting such a burden may well have been one of the reasons for the promulgation of the guideline. On the other hand, it should not be difficult for an employer to give specific reasons for the policy, such as the safety reasons advanced in this case.

It is true that EEOC regulations are entitled to somewhat less weight than those promulgated by an agency with Congressionally delegated rulemaking authority. *General Elec. Co. v. Gilbert,* 429 U.S. 125, 141, 97 S.Ct. 401, 410, 50 L.Ed.2d 343 (1976). Nevertheless, the EEOC guideline is entitled to "great deference" in the absence of "compelling indications that it is wrong." *Espinoza*

*v. Farah Mfg. Co.,* 414 U.S. 86, 94–95, 94 S.Ct. 334, 339–340, 38 L.Ed.2d 287 (1973). While one may reasonably differ with the EEOC's position as a matter of policy, I can find no such "compelling indications" in this case. The lack of directly supporting language in § 703(a)(1) or the legislative history of Title VII, relied on by the majority, does not in my opinion make the guideline "inconsistent with an obvious congressional intent not to reach the employment practice in question." *Id.* at 94, 94 S.Ct. at 339.

I conclude that if appropriate deference is given to the administrative interpretation of the Act, we should follow the guideline and uphold the district court's decision that a prima facie case was established. I believe, however, that triable issues were presented whether Spun Steak established a business justification for the rule, and I would remand for trial of that issue.