Iris COSME, Plaintiff,

v.

THE SALVATION ARMY, Defendant.

No. CIV.A. 01–12045–WGY.

United States District Court,
D. Massachusetts.

Sept. 23, 2003.

Frank J. Ciano, Law Offices of Frank J. Ciano, Cambridge, MA, for Iris Cosme, Plaintiff.

Jean A. Musiker, Sugarman, Rogers, Barshak & Cohen, Boston, MA, for The Salvation Army, Defendant.

Monica Lee Shearer, Law Offices of Frank J. Ciano, Cambridge, MA, for Iris Cosme, Plaintiff.

Darrel C. Waugh, Sugarman, Rogers, Barshak & Cohen, Boston, Ma, for The Salvation Army, Defendant.

*MEMORANDUM AND ORDER*

YOUNG, Chief Judge.

## I. INTRODUCTION

Dismissed from a thrift store (the "store") operated in Somerville by the defendant, the Salvation Army, Iris Cosme ("Cosme") complains that she was harassed, ridiculed, and discriminated against; that her rights under state law were violated; and ultimately, that she was wrongfully terminated by the Salvation Army. On January 28, 2003, following the filing by both parties of cross motions for summary judgment, this case was heard as a case stated.

### A. Procedural Posture

Cosme brought this action in the Massachusetts Superior Court sitting in and for the County of Middlesex on or about September 18, 2001. The Salvation Army removed the case to federal court on November 26, 2001. On October 1, 2002, after Alternative Dispute Resolution proved unfruitful, the parties moved for summary judgment. During the November 8, 2002, oral hearing on the cross motions for summary judgment, the parties agreed to have the case heard as a case stated and thus have consented to judgment on the written record. The case was heard as a case stated on January 28, 2003.

### B. Facts [1]

Cosme was employed as a full-time clerk at the store from August 12, 1996, until January 9, 2001. Def.'s Facts ¶ 7. Her duties included pricing and organizing store merchandise, assisting customers, and working at the cash register. *Id.* ¶ 8.

---

1. The factual overview is based on a statement of undisputed facts submitted by the Salvation Army and a response by Cosme, as well as the parties' motions and memoranda in support. As carefully explained to the parties, in entertaining this case as a case stated,

The manager of the store at all relevant times was Pamela Gnerre ("Gnerre"), who was quite accommodating to Cosme on a number of occasions. For example, she personally drove Cosme to Cosme's landlord's office and Cosme's son's school during working hours so that Cosme could attend to personal business. *Id.* ¶¶ 40–43. Gnerre also accommodated Cosme's need to adjust her schedule when child care issues arose. *Id.*

The Salvation Army had several rules relating to employee conduct and protocol, which included an English Language Policy, time sheets, and punctuality. The Employee's Manual provides a list of behavior constituting unsatisfactory conduct, including provision forty-two, which proscribes

[w]illful violation of the English Language Policy for Adult Rehabilitation Centers. This policy states that at all times while on the center premises, other than during break and meal periods and before and after work, every employee shall utilize English, to the best of the employee's ability, when speaking to any other employee, beneficiary, customer or to a supervisor. This rule shall not apply to conversations between employees held in nonworking areas, such as lunch room, break room, and restrooms. This rule shall also not apply where an employee at the center is engaged in a conversation with a thrift store customer in a language other than English, which both the employee and the customer understand. This rule shall also *not* apply when a supervisor requests that an employee interpret a conversation for the supervisor, another employee, or a customer.

---

the Court may draw such inferences as are reasonable from the undisputed facts in the record. *Continental Grain Co. v. P.R. Maritime Shipping Auth.,* 972 F.2d 426, 430 n. 7 (1st Cir.1992).

Guzicki Aff., Ex. HH [Docket No. 18] at 11.

Cosme was born in Puerto Rico and emigrated to the United States as an adult. Def.'s Facts ¶ 9. Her native language is Spanish and her command of English is not strong. *Id.* ¶ 19. Both parties agree that Cosme's English comprehension exceeded her propensity to speak the language. The parties disagree, however, about the extent of Cosme's ability to speak English.

The Salvation Army maintains that Cosme had "limited fluency" in English, and that she had sufficient English fluency to communicate with Gnerre[2] concerning "day-to-day work instructions" and to "assist English-speaking customers, engage in limited conversations with them, and answer simple questions." *Id* ¶¶ 19–21. The Salvation Army further asserts that Cosme was able to answer the phone and engage in simple conversation in English; when a conversation became too difficult, she would simply pass the phone to another employee. *Id.* ¶¶ 21–22.

Cosme, on the other hand, denies that she had sufficient English fluency. She admits being able to understand simple work-related instructions but alleges that Gnerre often asked another Spanish-speaking employee to assist when interacting with Cosme. Pl.'s Opp'n [Docket No. 29] at 5. It is not disputed that Cosme spoke Spanish—in working areas—almost every day that she worked at the store. Def.'s Facts ¶ 28.

It appears that Gnerre originally did not strictly enforce the various rules and policies at the store, including the English Language Policy. At some point in 1999, however, in response to her fear that employees were taking advantage of her, Gnerre's supervisor suggested she become more strict in enforcing the rules. *Id.* ¶¶ 44–45. Upon Gnerre's decision to become more authoritative, she began strictly enforcing the English Language Policy, among other rules. Gnerre enforced the English Language Policy particularly because she had received numerous complaints from non-Spanish-speaking employees and volunteers about other employees speaking in Spanish frequently. *Id.* ¶¶ 36–38. Specifically, the individuals complained that the conversations made them feel uncomfortable and excluded. *Id.* Gnerre, on numerous occasions, requested that Cosme speak in English. It appears that Gnerre tended to assume that when Cosme spoke to other workers in Spanish, she was making derogatory comments about Gnerre. *Id.* ¶¶ 64, 68.

In addition to failing to follow the English Language Policy, Cosme evidently also came to work late on numerous occasions. Following two verbal warnings, Cosme received a written warning for arriving late to work on March 8, 1999. *Id.* ¶¶ 48–49. Subsequent written warnings were issued on April 14, 1999, November 9, 1999, and November 10, 2000. *Id.* ¶¶ 51, 56, 57. The April 14th and November 9th warnings included language cautioning that any further instance of tardiness could lead to termination. *Id.* ¶¶ 51, 56; *see also* copies of warnings, Ex. R to Pl.'s Mem. in Support [Docket No. 24]. In total, Cosme received four written warnings concerning tardiness over a period of approximately nineteen months.

The parties dispute the significance of numerous other occasions on which Cosme either arrived late or left work early and for which she received no written warning. *See* Def.'s Facts ¶¶ 48–54, 57–58, 61, 63, 75. These instances were all recorded on Cosme's time sheets, but there is no rec-

---

2. Gnerre spoke English as a native language and did not understand Spanish (other than a few simple words of greeting). Def.'s Facts ¶ 9.

ord indicating that she received any discipline or warning on these occasions. Indeed, Cosme admits that she was late more than any other employee at the store but asserts that she believed her tardiness had been excused. Pl.'s Resp. [Docket No. 30] ¶¶ 47, 50, 53–58; Def.'s Facts ¶ 47.

The Salvation Army proffers three key incidents leading up to Cosme's termination by Gnerre that demonstrate that Cosme was insubordinate. The first incident occurred on November 3, 2000. On this occasion, Gnerre asked Cosme (in English) whether some clothes left on the floor belonged to Cosme. Cosme answered in Spanish despite repeated requests by Gnerre to try to answer in English. Cosme alleges that Gnerre responded by asking, "What the hell did you say?" and stating "I'm sick of you speaking Spanish." Cosme walked away from the discussion with what appeared to Gnerre to be a dismissive wave of the hand. Gnerre issued a warning notice to Cosme, citing her for insubordination and insolence and noting that, despite Gnerre's repeated requests of Cosme to speak English and general warnings against speaking Spanish, Cosme "insolently" refused to speak English. Gnerre believed that Cosme was able to respond in English but refused to do so. The warning stated that the next occurrence would result in suspension or termination. Def.'s Facts ¶¶ 59–60.

The second incident occurred seven days later on November 10, 2000, the day on which Cosme received her final written warning for tardiness, mentioned above. After being verbally reprimanded for being late, Cosme spoke in Spanish to a coworker. Gnerre overheard this exchange and repeatedly asked Cosme to tell her what she had said to the coworker. Cosme did not tell Gnerre what she had said, simply saying "Pam . . . it's nothing." *Id.* ¶¶ 64–66. Gnerre then suspended Cosme for one day and prepared the written warning, citing tardiness and speaking Spanish as the reasons for its issuance. *Id.*

The third incident occurred on December 30, 2000. At Gnerre's request, Cosme went to work at the cash register. On her way there, Cosme spoke in Spanish to a coworker, allegedly asking him to get her a cup of coffee. Gnerre overheard this and became upset, demanding to know that about which the two were speaking. Cosme claims that Gnerre said, "I am sick and tired of you people speaking Spanish here. Why don't you tell me to my face what you're saying about me," and threw a coffee cup against the back wall, causing the cup to break. At the end of her shift on this day, Cosme took a two-week vacation. *Id.* ¶¶ 67–70. When Cosme returned from vacation on January 9, 2001, she arrived late to work. *Id.* ¶ 75. She was fired the same day.

Evidently, the decision to fire Cosme was made during the period that Cosme was on vacation. The Salvation Army contends that Cosme was fired because of her insubordination and frequent tardiness. On the other hand, Cosme asserts that the actual reason for her termination was her speaking Spanish.

## II. DISCUSSION

This case comes before the court as a case stated, and the Court's role is that of fact-finder. In its capacity as such, the Court must draw all reasonable inferences with respect to the disputed facts:

> This procedural device is especially appropriate when the Court is faced with cross motions for summary judgment. The advantage of the case stated procedural device, of course, is that the Court need not draw all inferences against each moving party but, with the entire case stated before it, may instead draw

such inferences as are reasonable to resolve the case. *United Companies Lending Corp. v. Sargeant*, 20 F. Supp 2d 192, 195 (D.Mass. 1998).

Cosme essentially makes two claims against the Salvation Army. First, she claims that the Salvation Army discriminated against her for speaking Spanish. Second, she claims that the Salvation Army harassed her. The Court addresses each in turn.

## A. Discrimination/Disparate Treatment

■ A plaintiff must prove four elements to establish a case of disparate treatment under Mass. Gen. Laws ch. 151B § 4:(a) membership in a protected class; (b) harm; (c) discriminatory animus; and (d) causation. *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 502, 751 N.E.2d 360 (2001); *MacCormack v. Boston Edison Co.*, 423 Mass. 652, 662–63, 672 N.E.2d 1 (1996). When interpreting Mass. Gen. Law ch. 151B, "[the Court] may look to the interpretations of Title VII of the analogous Federal statute; [the Court is] not, however, bound by interpretations of the federal statute in construing [the] State statute." *College–Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination*, 400 Mass. 156, 163, 508 N.E.2d 587 (1987).

The Salvation Army concedes that Cosme is a member of a protected class (being of Puerto Rican origin) and has suffered harm (through being disciplined and ultimately terminated); it denies, however, that there is any discriminatory animus.[3]

■ A plaintiff can prove discriminatory animus through direct or indirect evidence. *Wheelock College v. Mass. Comm'n Against Discrimination*, 371 Mass. 130, 137–38, 355 N.E.2d 309 (1976). Cosme first argues that there is direct evidence of discriminatory animus. Direct evidence is evidence that, "if believed, results in an inescapable, or at least highly probable, inference that a forbidden bias was present in the workplace." *Wynn & Wynn, P.C. v. Mass. Comm'n Against Discrimination*, 431 Mass. 655, 667, 729 N.E.2d 1068 (2000) (quoting *Johansen v. NCR Comten, Inc.*, 30 Mass.App.Ct. 294, 300, 568 N.E.2d 611 (1991)). Typically, direct evidence consists of statements of discriminatory intent attributable to an employer. *Wynn*, 431 Mass. at 667–68, 729 N.E.2d 1068. "Not surprisingly, such evidence is rarely presented." *Chief Justice for Admin. and Management of Trial Court v. Mass. Comm'n Against Discrimination*, 439 Mass. 729, 733 n. 11, 791 N.E.2d 316 (2003). In support of direct evidence of discrimination, Cosme merely asserts that Gnerre requested her to speak English on numerous occasions. The Court, however, is not persuaded by Cosme's argument because the Salvation Army's English Language Policy provides a clear and valid basis for such requests. Therefore, the question is whether Gnerre displayed discriminatory animus against Cosme indirectly.

■ The legal framework for analyzing indirect discriminatory animus under Massachusetts law mirrors the three-stage burden-shifting analysis first articulated by the Supreme Court of the United States in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Wheelock College*, 371 Mass. at 134–37, 355 N.E.2d 309. The first stage requires the plaintiff to estab-

---

**3.** The Court does not reach the issue of causation because the element of discriminatory animus is determinative here.

lish a prima facie case of discrimination. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. A prima facie case, once established, "creates a presumption of discrimination." *Abramian v. President & Fellows of Harvard College,* 432 Mass. 107, 116, 731 N.E.2d 1075 (2000). That presumption of discrimination may be rebutted in the second stage of the analysis if the employer can articulate "a legitimate, non-discriminatory reason for its action" backed by "credible evidence [showing] that the reason or reasons advanced were the real reasons." *Wheelock College,* 371 Mass. at 136, 138, 355 N.E.2d 309. Finally, if an employer presents a non-discriminatory reason for its decision with an adequate evidentiary backing, the plaintiff must persuade the trier of fact by a preponderance of the evidence that discriminatory animus was the "determinative cause" for the employer's decision. *Lipchitz,* 434 Mass. at 504, 751 N.E.2d 360. A fact-finder's decision in this third stage may be based, either in whole or in part, on a determination that a legitimate reason for the employer's decision advanced in stage two was actually a pretext. *Id.* at 500–01, 751 N.E.2d 360.

**1. The First Stage: Prima Facie Case**

■ Generally, a plaintiff must make four showings to establish a prima facie case of discrimination: (1) the plaintiff is a member of a protected class; (2) the employer took an adverse employment action against him; (3) the plaintiff was qualified for the job; and (4) after the plaintiff's departure, her position remained open or the employer sought someone of roughly equivalent qualifications to perform substantially the same work. *Straughn v.*

*Delta Air Lines, Inc.,* 250 F.3d 23, 33 (1st Cir.2001); *Feliciano de la Cruz v. El Conquistador Resort and Country Club,* 218 F.3d 1, 5 (1st Cir.2000). The precise requirements of a prima facie case can vary depending on context and were "never intended to be rigid, mechanized, or ritualistic." *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978).

Cosme has satisfied, through the Salvation Army's admissions, two of the four elements required to establish a prima facie case of indirect discriminatory animus. As mentioned above, the Salvation Army conceded that Cosme is a member of a protected class and that she was terminated. The elements of the prima facie case in dispute are Cosme's ability to perform her job and the current status of the position she held at the store.

■ First, Cosme's argument that she is able adequately to perform her job puts her in an awkward position. In order to be considered qualified for her position, she must be able to converse with the management, other employees, and customers sufficiently to carry out the day-to-day requirements of her job.[4] In other words, to meet the third element of her prima facie case, Cosme must show she can speak English sufficiently to perform her job. Cosme, however, asserts that she could not speak English adequately, and, therefore, it was discriminatory to require her to speak English. This argument is misplaced because, if true,[5] the Court would be forced to conclude that she could not speak English adequately to perform her job.

Based on the record, however, the Court holds that Cosme adequately spoke En-

---

4. No other potential job qualifications are in dispute here.

5. The Court has already established above that a request to speak English—given the English Language Policy—is not discriminatory.

glish and, as such, could adequately perform her job. Gnerre and Cosme agree that the two had a good relationship before Gnerre began strictly enforcing the rules. Cosme admits to being able to understand simple work-related instructions but alleges that Gnerre often asked another employee to interpret when interacting with her. Pl.'s Opp'n at 5. The Court finds this assertion disingenuous because the record shows Gnerre helped Cosme on numerous occasions, taking her to her son's school and to her landlord's place of business to pay rent. It is unrealistic for the Court to believe that Gnerre (who does not speak any Spanish, other than a few words of greeting) and Cosme never communicated in the car without an interpreter. Cosme and Gnerre must have fostered a relationship built on Cosme's (limited) English language abilities. Indeed, both Cosme and Gnerre admit to having made each other laugh—a feat normally requiring a certain level of common lingual understanding.

In addition, Cosme was quite able to defend herself, in English, when necessary. For example, when Cosme was questioned about her tardiness on November 3, 2000, Cosme responded "Pam, it's only 8:31 [A.M.]" Def.'s Facts ¶¶ 65. When Gnerre questioned Cosme about what she was saying to a coworker, Cosme responded "Pam ... its nothing." *Id.* at 66. While at first glance these terse responses seem unremarkable, they represent adequate language comprehension. In sum, this Court holds that Cosme possessed the ability to speak English adequately to establish a relationship with Gnerre and to carry out day-to-day job related functions. Therefore, the Court is satisfied that Cosme was qualified for her job.

With respect to the fourth element of Cosme's prima facie case, however, the evidence presents a closer question.

Cosme must show that her position remained open or was filled by a person whose qualifications were similar to hers. *Straughn*, 250 F.3d at 33. The Salvation Army did not hire an employee to fill Cosme's absence after her termination, Def.'s Mem. [Docket No. 17] at 10, but there is little credible evidence with respect to whether the store was looking to hire anyone to fill Cosme's position. As mentioned above, the prima facie standard is flexible. *Wheelock College*, 371 Mass. at 135 n. 5, 355 N.E.2d 309 (noting that the proof required of a plaintiff may vary). Given this flexibility, the Court assumes that Cosme has proved this final element of her prima facie case. Notwithstanding meeting her prima facie burden, however, Cosme's claim fails for other reasons.

### 2. The Second Stage: Non–Discriminatory Reasons For Dismissal

█ As mentioned above, after the plaintiff establishes her prima facie case, the burden of going forward shifts to the defendant to rebut the inference of discrimination by articulating a legitimate, non-discriminatory reason for the termination of the plaintiff's employment. *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. 1817. The Salvation Army asserts two such reasons: insubordination and tardiness.

#### a. Insubordination

The Salvation Army points to three incidents of Cosme's "insubordination," for which she was disciplined prior to her dismissal. Def.'s Mem. at 13–14. First is the November 3, 2000 incident, during which Gnerre asked Cosme (in English) whether some clothes left on the floor belonged to Cosme and Cosme responded in Spanish, despite Gnerre's repeated requests for Cosme to answer in English. Def.'s Facts ¶¶ 59–60. The second inci-

dent occurred seven days later on November 10, 2000, when Cosme received her final written warning for tardiness. After verbally reprimanding Cosme for being late, Gnerre overheard Cosme speak in Spanish to a coworker and Cosme continued to speak in Spanish, despite Gnerre's requests to cease. *Id.* The third incident occurred on December 30, 2000, when Cosme again spoke in Spanish to a coworker and Gnerre overheard the comment. Def.'s Facts ¶¶ 67–70.

Cosme argues that Gnerre characterized the mere act of speaking Spanish as constituting insubordination; indeed, the three incidents all involved Cosme speaking Spanish. The insubordination, however, arose from Cosme's refusal to accommodate the requests of her supervisor, Gnerre. In other words, the issue is not that Cosme spoke Spanish, but that she ignored Gnerre's requests and directives.

Furthermore, several of Cosme's fellow employees (and Cosme's sister-in-law, J. Melendez) admitted in their depositions that Cosme was a "tough lady," Melendez Aff., Ex. K [Docket No. 24] ¶ 20, that she often spoke back to Gnerre and gave Gnerre "the finger" behind her back, Melendez Aff., Ex. 7, 40 ¶ 8, and that the Cosme was a "very cocky little girl" and "she didn't like authority," Daniell Aff., Ex. 8 ¶¶ 22–24. These testimonials further support the Salvation Army's assertions that Cosme did commit insubordination on numerous occasions. Any arguments that Cosme was unaware that her behavior constituted insubordination is belied by the fact that she was told in writing more than once that any further incident would result in termination.

In sum, the Court finds that the alleged insubordination occurred, notwithstanding

the language spoken, and inhered in Cosme's refusal to obey the requests of her supervisor. Thus, the Court rules that the Salvation Army has produced a valid, non-discriminatory reason for Cosme's termination.

### b. Tardiness

▪ The Salvation Army contends that Cosme's tardiness was an additional valid reason for her termination.[6] Specifically, it asserts four recorded incidents of tardiness, as well as other evidence that Cosme was late on other occasions for which she was not reprimanded in writing.

Cosme does not contest that she received four written warnings concerning tardiness over a period of approximately nineteen months, but she disputes the significance of numerous other occasions on which she either arrived late or left early. *See* Def.'s Facts ¶¶ 48–54, 57–58, 61, 63, 75. As mentioned above, Cosme received a written warning for arriving late to work on March 8, 1999; this had been preceded by two verbal warnings. *Id.* ¶¶ 48–49. Subsequent written warnings were issued on April 14, 1999, November 9, 1999, and November 10, 2000. *Id.* ¶¶ 51, 56, 57. The warnings of April 14th and November 9th stated that any further instance of tardiness could lead to termination. *Id.* ¶¶ 51, 56. In addition to those instances recorded in the written warnings, the evidence establishes that Cosme frequently arrived late or left early.

Cosme asserts that she believed her other incidents of tardiness had been excused, but the record reveals this belief to be unfounded. While it is true that Gnerre had excused Cosme's tardiness on occasion, these occasions appear to have occurred *before* Gnerre decided strictly to

---

6. While tardiness may be a factor sufficient in and of itself to satisfy the non-discriminatory requirement, it can also be seen in further-

ance of the Salvation Army's insubordination argument.

enforce the rules. Moreover, Cosme herself admits that in 1999, after she had received two warnings, things changed— "things weren't going that well." Ex. 3 to Def.'s Mot. for Summ. J. [Docket No. 16] ¶¶ 10–13. The Court is not persuaded that Cosme believed the non-recorded occasions of tardiness had been excused. Nor is this Court persuaded that Cosme's tardiness actually had been excused given the frequency and the rigidity with which Gnerre enforced the rules.

The Court therefore rules that the Salvation Army has proffered two non-discriminatory reasons for Cosme's termination.

### 3. Pretext

 Finally, to prove a claim of discrimination through indirect evidence, Cosme must submit evidence that the Salvation Army's articulated reason for the termination was mere pretext for the discriminatory motive underlying Cosme's termination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817. To that end, Cosme alleges that the true reason for her termination was her speaking Spanish.

First, the fact that the Salvation Army has made other termination decisions because of tardiness undercuts Cosme's pretext argument. Indeed, the record shows that two non-Hispanic employees were terminated for attendance-related infractions.

 Second, while there may be some support for Cosme's argument that termination for speaking Spanish is impermissible, Cosme has not carried her burden of proving pretext. As a preliminary matter, an English Language Policy does not, in and of itself, constitute discrimination or disparate treatment for bilingual employees. *See, e.g., Garcia v. Spun Steak Co.,* 998 F.2d 1480, 1488 (9th. Cir.1993)(concluding that a bilingual employee is not discriminated against, that is, denied a privilege of employment, by an English-only policy under Title VII); *Garcia v. Gloor,* 618 F.2d 264, 272 (5th Cir.1980) (same); *Kania v. Archdiocese of Phila.,* 14 F.Supp.2d 730, 735–36 (E.D.Pa.1998) (same).

 In addition, Cosme argues that the English Language Policy adopted by the Salvation Army violates Equal Employment Opportunity ("EEOC") Regulations, which lends further support to her discrimination claim. Pl.'s Mot. for Summ. J. [Docket No. 19] at 7–8.[7] In relevant part, the EEOC regulations distinguish between blanket rules requiring that English be spoken at all times, which the regulations prohibit, and more limited rules requiring that English be spoken at particular times. 29 C.F.R. § 1606.7. With respect to more limited rules, the regulations provide that "[a]n employer may have a rule requiring that employees speak only in English at certain times where the employer can show that the rule is justified by business necessity." 29 C.F.R. § 1606.7(b). Furthermore, the regulations note that employees may inadvertently slip into speaking their native language and provide:

> [I]f an employer believes it has a business necessity for a speak-English-only rule at certain times, the employer should inform its employees of the general circumstances when speaking only

7. In her Motion for Summary Judgment, Cosme argues that the Salvation Army has violated, inter alia, EEOC regulations. It is unclear whether she is attempting to argue that a violation of the regulations gives rise to a separate cause of action, although she did not so claim in her complaint. A violation of EEOC regulation, however, does not—in and of itself—engender an independent cause of action because the regulations are not controlling upon this Court. *See, e.g., Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

in English is required and of the consequences of violating the rule. If an employer fails to effectively notify its employees of the rule and makes an adverse employment decision against an individual based on a violation of the rule, the Commission will consider the employer's application of the rule *as evidence of discrimination* on the basis of national origin.

29 C.F.R. § 1606.7(c) (emphasis added).

■ While the EEOC regulations may offer guidance to the Court, the Court is not bound by them. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) ("As an administrative interpretation of the Act by the enforcing agency, these Guidelines, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts ... may properly resort for guidance.") (internal citations and quotation marks omitted); *see also Spun Steak Co.,* 998 F.2d at 1489; *Kania,* 14 F.Supp.2d at 735–36; *Prado v. L. Luria & Son, Inc.,* 975 F.Supp. 1349, 1357 (S.D.Fla. 1997) (noting in that instance the EEOC Guidelines were valid and finding that the English-only rule passed the test of business necessity).

■ Moreover, even if this Court were to follow the EEOC regulations in question, it is clear that, while the EEOC does not favor English-only policies, the mere existence of one does not necessarily violate the regulations. In *Prado,* for example, the court ruled that a stringent English-only policy did not violate EEOC regulations when employees had notice of the policy and the policy furthered a legitimate business interest. 975 F.Supp. at 1357. In *Prado,* the court ruled that facilitating the supervision and evaluation of employees, fostering a sense of community, and minimizing alienation and hostility between speakers of different languages

constituted proper justification for an English-only policy under EEOC regulations. *Id.* at 1357. Similarly in this case, the Salvation Army's employee handbook—received by all new employees, thereby providing proper notice—describes the legitimate business reasons for its policy: "to promote workplace harmony by ensuring that employees are able to communicate with customers, coworkers and supervisors: to help managers monitor employees, and to improve productivity and efficiency." Def.'s Opp'n at 17. Although this handbook was available only in English and the Salvation Army failed to produce an affidavit or testimony to verify the stated purpose, the Court finds that the Salvation Army has—albeit minimally—complied with EEOC regulations, even if the regulations were binding on this Court.

Finally, even if Cosme could prove that the Salvation Army's English Language Policy discriminates against monolingual, non-English-speaking employees, this Court has already found that Cosme retained sufficient English ability to perform her job and communicate with the people in the store. In other words, her argument—even if the Court found it persuasive (which it does not)—is not applicable to her case. *See, e.g., Gloor,* 618 F.2d at 272 (concluding that bilingual employees suffer no adverse impact from an English-only policy under Title VII).

The Court, therefore, rules that the proffers of insubordination and tardiness are not merely pretextual reasons for Cosme's termination, and, accordingly, these reasons rebut any presumption of discrimination in this case.

### B. Harassment

To succeed on a harassment claim, Cosme must show by a preponderance of the evidence that she was subjected to

ethnic slurs, or other physical or verbal treatment, sufficient to create a hostile work environment. *Sarin v. Raytheon,* 905 F.Supp. 49, 52 (D.Mass.1995) (Lasker, J.). Cosme has failed to present any evidence of harassment and thus her claim fails.

## C. Disparate Impact

■ In order to bring an action for discrimination, a plaintiff must first file an administrative charge with the Massachusetts Commission Against Discrimination ("MCAD"). *Lattimore v. Polaroid Corp.,* 99 F.3d 456, 464 (1st Cir.1996). Here, the Salvation Army aptly points out that the terms of Cosme's MCAD charge did not present a disparate impact claim. Ex. 10 to Def.'s Mot. for Summ. J. at 1. Therefore, to the extent Cosme attempts to raise a disparate impact claim based on the existence of the English Language Policy, she is precluded because she did not first file such a charge with the MCAD.

## II. CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment [Docket No. 16] is ALLOWED and Plaintiff's Motion for Summary Judgment [Docket No. 21] is DENIED. Judgment shall enter for the Defendant.

SO ORDERED.